[Crim. No. 18771. First Dist., Div. Two. Apr. 9, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY RAY CLEM, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Wendy Shane, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Thomas A. Brady and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—Defendant is appealing his conviction by a jury of five counts of rape by force and threat (Pen. Code, § 261, subds. 2, & 3), as well as misdemeanor assault (Pen. Code, § 240), misdemeanor petty theft (Pen. Code, §§ 484-488), and false imprisonment (Pen. Code, § 236).

Upon finding the defendant to be a mentally disordered sex offender, the court committed him to a state hospital for a period not to exceed the maximum for which he could be confined pursuant to Welfare and Institutions Code, section 6316.1, subdivision (a), a period of eleven years and four months.[1]

---

[1] The total sentence for the five counts of rape was ten years and four months. Sentence on the count of false imprisonment was stayed by the court, apparently in agreement with the view of the district attorney's office that the false imprisonment in the instant case was incidental to the rape and would constitute multiple punishment as prohibited by Penal Code, section 654.

The victim in this case, Ms. B., was first approached by the defendant at a bar, shortly after midnight, while she was waiting for a pool table to open up. Defendant initially contacted Ms. B. by claiming that he knew her, but she denied knowing the defendant. Ms. B. testified that although she responded to the defendant's questions as they were asked, she had no desire for further conversation or contact with the defendant. Defendant asked her to guess his age, which she correctly guessed to be 23. When asked how she knew, she replied that he looked like a "nice young kid." Being referred to as a kid apparently "bothered" the defendant, as did the fact that Ms. B. continued to play pool. When Ms. B. prepared to leave defendant offered to walk her to her car, which she refused, whereupon defendant hinted that he would like a ride home. Ms. B. finally offered him a ride.

Defendant instructed Ms. B. to turn down one street because it would be "faster." He then told her to pull over, but instead of getting out of the car attempted to kiss her. She pushed him away, whereupon defendant hit her in the face, took the wheel and steered the car around the corner and parked it. Defendant then shoved Ms. B. into the back seat, telling her that she should not have called him a kid and that he would show her he was a man, undid his pants, and committed the first act of rape upon her. Within the space of approximately two to two and one-half hours, during which time the defendant held Ms. B. captive, the defendant succeeded in at least four more vaginal penetrations.

Defendant eventually got out of the car, whereupon Ms. B. locked the car doors and drove herself to the police station. The results of a medical examination by a hospital emergency room physician immediately following the incident were consistent with Ms. B's. claim that she had been raped.

Defendant was arrested at his place of work approximately two weeks later.

Upon his arrest, defendant was advised of his rights, and in a tape-recorded statement waived them. The tape recorder was then shut off, ostensibly to allow defendant a chance to organize his oral statement. While the tape recorder was off a police officer questioned defendant. Defendant denied any knowledge of the crimes. He admitted that on the evening of the incident in question, Ms. B. had given him a ride home, but claimed that upon arrival at his residence he had gotten out of the car without further event. Defendant was not specifically asked if

he had had sexual intercourse with Ms. B., nor did he volunteer information on that subject. When the tape recorder was again turned on to record his statement, defendant declined to speak further with the police without counsel. He was not interrogated further.

At his trial defendant admitted to having had sexual intercourse with Ms. B., but claimed that to the best of his inebriated recollection it was consensual. On cross examination, the prosecutor asked the defendant why he had failed to convey this relevant information to the police at the time of his statement, in fact indicating that nothing further had transpired with Ms. B. upon arrival in her car at his residence.

"Q.  You didn't think that was important to tell him?

"A.  Well, I was, you know, nervous at the time and I didn't you know, I was always told, you know, to have a lawyer present, and at first I told him I wanted to talk about it and then when he told me what happened, I thought it would be best if I talked to a lawyer first.

"Q.  So you were covering up at first?

"A.  Well, I don't know what you call it sir.

"Q.  Well, you didn't tell him everything that happened?

"A.  No, sir.

"Q.  Because you knew you were charged with rape?

"A.  Yes, sir."

The prosecution then made reference to this omission in its closing argument as an indicia of defendant's guilt. "[Y]ou can consider the content of their [witnesses'] testimony, itself, whether or not they had a bias or motive, some reason for not telling you the truth or some reason for testifying the way that they did and whether or not they made some admissions of falsehoods.

"For instance, the Defendant testified that he didn't tell Officer Bertram all that had happened. And I asked him, well, you were holding it back, and he said, yes. And that was having to do with whether or not he had intercourse with the victim." The trial court also instructed the

jury that they might consider any false or deliberately misleading statements of the defendant as tending to prove a consciousness of guilt, although not sufficient in and of itself to prove guilt. (CALJIC No. 2.03.)

Defendant contends that reference by the prosecution and the court to his postarrest silence on the subject of sexual intercourse with Ms. B. violated his right against self-incrimination as defined by *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] and *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], holding that a defendant's exercise of his constitutional right to remain silent may not be subverted by use of that silence in making a case against him.

*Doyle* specifically addressed comment by the prosecution on defendant's exercise of the right to remain silent after having been given *Miranda* warnings, and held that the use of defendant's silence for impeachment purposes deprived him of due process. (*Doyle, supra* at p. 620 [49 L.Ed.2d at p. 99].)

This court in *People* v. *Barker* (1979) 94 Cal.App.3d 321 [156 Cal.Rptr. 407], recently distinguished the facts in *Doyle* from facts substantially those of the instant case. In *Barker*, the defendant, while still a suspect, gave a fully exculpatory statement to the police. At his trial he confessed to his participation in the crime, but now claimed coercion as a defense. The prosecution repeatedly impeached defendant's credibility by comparison of his exculpatory prearrest story and his testimony on the stand. In *Doyle*, defendant offered no explanation to the police prior to his trial, claiming for the first time at trial that he had been "framed." The prosecutor attempted to impeach the defendant with his failure to assert the "frame-up" defense after receiving *Miranda* warnings at the time of his arrest.

As pointed out in *Barker*, the simple difference between the two situations is that in *Doyle*, the prosecutor sought to impeach the defendant with his refusal to talk to the police. In *Barker*, the prosecutor sought to impeach the defendant with what defendant *did* say to the police. (*Barker, supra*, 94 Cal.App.3d, at p. 328.)

The principle enunciated by *Doyle* is that while statements by an arrestee may be used against him, the exercise of his constitutional privilege must carry no penalty. (*People* v. *Farris* (1977) 66 Cal.App.3d

376, 390 [136 Cal.Rptr. 45].) In this case defendant stipulated that he had been given his *Miranda* rights specifically to avoid objectionable mention at trial of the fact the defendant had exercised those rights. And, in fact, no mention was made by the prosecution of the fact that defendant had exercised his right to remain silent. ■ However, the exercise of his *Miranda* rights in the midst of his statement to the police does not erase the statement previously given. A fully voluntary statement to police followed by invocation of the right to remain silent does not render the voluntary statement somehow the less voluntary and thus inadmissible. Defendant would have us believe that a deliberate omission in a voluntary statement to police is tantamount to an exercise of the right to remain silent. The principle of *Griffin/Doyle* cannot be strained so far.

As the statement by defendant in this case was freely and voluntarily given, the prosecution was within its rights both on cross-examination and in argument, and the court properly instructed the jury that defendant's false or misleading statements might be considered as tending to prove consciousness of his guilt.

Defendant also contends that instruction of the jury per CALJIC No. 2.52, which allows the jury to consider defendant's "flight" following the commission of the crime, had no basis in the evidence and was highly prejudicial. ■ We agree that the court was in error in giving the instruction, but cannot concur that the defendant was prejudiced thereby. Testimony by Ms. B. was that the rape sequence of events terminated when defendant emerged from her car for a sufficient amount of time to allow her to lock her car doors and drive away. Common sense requires a realistic look at just who was fleeing from whom. The mere fact that defendant did not remain at the scene of the crime for a time sufficiently convenient to enable the police to effect his arrest, but was arrested some days later at a different locale is insufficient evidence to warrant an instruction on flight after crime as evidencing a consciousness of guilt. (*People* v. *Watson* (1977) 75 Cal.App.3d 384, 403 [142 Cal.Rptr. 134].)

■ However, in the face of the overwhelming evidence of defendant's guilt, we do not find that defendant was prejudiced by the instruction. Defendant admitted to having had sexual intercourse with Ms. B., and the evidence clearly showed that the act had been committed by multiple rapes. Under the applicable standard, there is no reasonable probability that a result more favorable to the defendant

would have been reached had the instruction on flight not been given. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant next claims that it was prejudicial error to instruct the jury that evidence of preoffense oral statements by the defendant of intent, plan, motive or design should be viewed with caution, in the absence of evidence of any such statement. (CALJIC No. 2.71.7.) We do not agree that there was no evidence which might reasonably have been interpreted as statements of defendant's intent.

■ The offense in this case is rape. Shortly before the commission of the first act of rape, defendant told the victim to "turn down this road, it will be faster." Immediately prior to defendant's initial penetration, he told her to take off her clothes, and that he would show her that he was a man. Unlike the evidence of flight after crime, the preoffense statements made by the defendant could be interpreted as statements of intent or motive, and were sufficient to justify the court giving the instruction on preoffense statements of intent.

■ The defendant correctly asserts that it was inappropriate to give CALJIC No. 1.23[2] as a definition of consent in a forcible rape case. Just that part of the instruction to the effect that a person must act freely and "not under the influence of fraud, . . ." alone renders the instruction inappropriate, because fraud in the inducement—as opposed to fraud in the factum—will not vitiate consent in a forcible rape case. (*People* v. *Harris* (1979) 93 Cal.App.3d 103 [155 Cal.Rptr. 472].) However, the court in this case also gave instructions per CALJIC Nos. 10.00 and 10.01[3] affirmatively defining the type of force and resistance sufficient to vitiate consent peculiar to the crime of rape. An erroneous

[2]"To constitute consent on the part of a person to a criminal act or transaction, he must act freely and voluntarily and not under the influence of fraud, threats or force or duress.

"He must have knowledge of the true nature of the act or transaction involved, and he must possess sufficient mental capacity to make an intelligent choice whether or not to do something proposed by another.

"In law, consent differs very materially from assent. The former denotes a free will, a positive state of mind and positive cooperation in act or attitude.

"Assent, however, means mere passivity or omission and does not amount to comsent [*sic*]."

[3]"The crime of rape as charged against the Defendant in this case is an act of sexual intercourse with a female person who is not the wife of the perpetrator where she resists, but her resistance is overcome by force or violence.

"The conduct of a female person need only to be such as to make the absence of consent and the actual resistance reasonably apparent.

"The resistance must be proportioned to the outrage. And the amount of resistance

instruction may be cured by other correct instructions which so cover the case that it does not reasonably appear that the jury were misled. (*Waller v. Southern Pacific Co.* (1967) 66 Cal.2d 201, 213 [57 Cal.Rptr. 353, 424 P.2d 937]; *Miner v. Dabney-Johnson Oil Corp.* (1933) 219 Cal. 580, 583 [28 P.2d 23].) In view of the specific and comprehensive rape instructions given by the court, and in view of the absence of evidence of a fraud issue in this case, we do not think the jury could have been misled.

Defendant maintains that he cannot be sentenced for five separate counts of rape, when there was but one single sexual transaction, and that such sentencing violates Penal Code, section 654 prohibiting such multiple punishment. ■ It can no longer be argued that where there are multiple sexual acts performed upon a single victim, albeit within a short space of time, that each act does not comprise a distinct and separate violation and punishment. (*People v. Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63]; *People v. Hicks* (1965) 63 Cal.2d 764 [48 Cal.Rptr. 139, 408 P.2d 747]; *People v. Slobodion* (1948) 31 Cal.2d 555 [191 P.2d 1].)

Defendant attempts to distinguish *Perez* from the instant case on the grounds that *Perez* involved sexual acts of diverse types—rape, sodomy, oral copulation (*Perez, supra,* at p. 549)—and that the instant case involves sexual acts of but one type—vaginal penetration. Defendant argues that the several vaginal penetrations constitute but one act of rape, defendant's single objective and intent being sexual intercourse with the victim.

---

required depends upon the surrounding circumstances such as the relative strength and the ability of the parties, the age and condition of the female, the uselessness of resistance as it would appear to her and the degree of force shown by the perpetrator.

"She is not required to resist until either her strength or consciousness is gone.

"Her resistance need continue only until it becomes so apparently useless as to justify its cessation.

"The crime of rape as charged against—as charged against the Defendant in this case is an act of sexual intercourse with a female person without her consent and who is not the wife of the perpetrator where she is prevented from resisting by threats of great and immediate bodily harm accompanied by the apparent power of the perpetrator to carry out such threats.

"When a woman reasonably determines that she cannot resist without peril to her life or safety, no resistance is required.

"And if she submits to an act of sexual intercourse induced by fear that it is necessary to save her from violence or death, her conduct under such circumstance does not constitute consent to the act."

Under Penal Code, section 261 rape is an *act* of sexual intercourse. Any sexual penetration, however slight, is sufficient to complete the crime. (Pen. Code, § 263.) The act is not defined by the sexual gratification of the rapist. (*Perez, supra,* at p. 552.) Nor should the punishment depend upon the implementation by the rapist of but one as opposed to a variety of forms of sexual intercourse. As stated in *Perez,* at page 553, "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." This is equally applicable to several acts of one sexual type as it is to several acts of a variety of sexual types. If this were not so there would be no way in which to make the punishment fit the crime (*Perez, supra,* at p. 552), and we would be in the absurd position of rewarding the rapist for his lack of sexual imagination.

Each penetration of the victim in this case must be considered a separate act of rape, and the sentencing on counts one through five does not constitute multiple punishment as prohibited by Penal Code, section 654.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied May 9, 1980, and appellant's petition for a hearing by the Supreme Court was denied June 19, 1980. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.