[Crim. No. 11645. Fourth Dist., Div. One. Aug. 17, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE JAMES EPPS, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Victoria Sleeth, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom, Bernard A. Delaney, Jr., and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**COLOGNE, Acting P. J.**—Willie James Epps was charged with unlawful intercourse with a female minor not his wife (Pen. Code,[1] § 261.5), annoying or molesting a minor (§ 647a), and contributing to the delinquency of a minor (§ 272). The jury found him guilty of one count of annoying or molesting a minor and acquitted him on the other two charges. He appeals his conviction.

Epps was a nursing assistant in the adolescent in-patient unit of the county mental health center (CMH). Among his duties were supervising the teenagers' activities and talking with them. He was apparently very friendly with the patients. At one point, his supervisor suggested he be less friendly and provide more of a role model.

Among the patients at CMH was Linda B., a 14-year-old who voluntarily committed herself upon an agreement with her father and in the apparent hope she would live with him upon her release from CMH. Linda was a runaway, a periodic abuser of alcohol, was seductive in her manner and appearance, easily angered and had a tendency to manipulate others. She was experiencing the symptoms of the venereal disease, herpes, while she was at CMH.

Linda testified she and Epps developed a relationship involving kissing and touching in the unit's day room and in her own room. She and Epps agreed to get together on February 18 when she was out on a pass. Epps gave her his phone number and told her to call with directions to her father's apartment. On February 18, she met Epps who bought her alcohol, gave her marijuana and fondled her in his car. Approximately two days later, she met Epps in the unit's laundry room, where he was assigned to do laundry, and they engaged in activity causing intense sexual arousement causing Epps to ejaculate. Linda said they had intercourse, but Epps denied that occurred. The relationship between the two then cooled. On February 26, the day she learned she would not be going home from CMH but to a 24-hour school instead, Linda wrote a letter to Epps telling him how it would not work out between them. Epps read the letter, crumpled it and threw it away, but returned it to Linda when she asked for it.

During the week of March 5, the week before Linda was to leave for the 24-hour school, she told various patients she was going to "leave

---

[1]All references are to the Penal Code unless otherwise specified.

with a bang." On Friday, March 9, Linda reported she had had sexual intercourse with Epps, saying she did not want the same thing to happen to another patient who might not be able to handle it as well as she did.

At trial, Epps denied ever kissing or fondling Linda, although he mentioned she had a habit of running up to male staff, kissing them, then running off laughing, and one time she took his hand and put it on her breast, but he quickly pulled it away. Epps also denied giving Linda his phone number or meeting her on a pass. As to the laundry room incident, Epps testified that on February 25 Linda came into the laundry room when he was on duty and suggested they have sex. He refused her, turned her around and marched her out. However, in a statement to the police, Epps admitted he had kissed Linda several times and that they kissed and embraced and rubbed their bodies together in the laundry room. When he felt he was going to ejaculate, he went into the adjoining bathroom and did so.

At trial, Barbara C., Linda's friend and fellow patient at CMH, Dr. Brown to whom Linda reported the sexual intercourse, and Detective Dreis the police officer who interviewed Linda, testified as to Linda's statements about the relationship and the sexual intercourse. These were introduced as prior consistent statements to rebut Epps' charge that she fabricated everything because she was angry with his unfriendliness and with having to go to a 24-hour school.

Also introduced at trial were three prior uncharged sexual encounters between Epps and other females in a mental hospital setting. Two were offered for impeachment purposes only; the third was offered also to show Epps used a common design, scheme, or plan as well as to corroborate Linda's testimony.

On appeal, Epps contends the court erred in admitting the three prior acts, failing to give CALJIC No. 17.01, and in allowing in Linda's hearsay statements. Epps also contends the judgment must be reversed because of prosecutorial misconduct and insufficiency of the evidence.

### IMPROPER IMPEACHMENT

Epps contends that evidence of two prior similar acts was improperly used for impeachment. Both were admitted on the prosecution's rebut-

tal as prior inconsistent statements of the witness. In neither instance did the trial court admonish the jury, either at the time of the testimony or during the jury instructions, that the statements were for the limited purpose of impeachment.

### (1) *Sandra W.*

Sandra was a 14-year-old female patient in the adolescent unit of CMH. She was there at the same time as Linda and Epps. Since she had run away, Sandra was unable to testify at trial. However, during Epps' cross-examination, he was asked if he had ever kissed Sandra or told Detective Dreis he had kissed Sandra on numerous occasions. Defense counsel objected. The district attorney argued that since on direct examination he had denied kissing any of the female patients at CMH, Epps could be impeached by his prior inconsistent statement to Detective Dreis. The trial court, apparently accepting this reasoning, permitted the question about kissing Sandra, which Epps denied both doing and admitting, and later allowed Detective Dreis to testify on rebuttal as to Epps having told Dreis that he had. However, in fact, on direct examination Epps never denied kissing any female patients at CMH. He was only asked and only responded about kissing Linda.

In a similar case, *People* v. *Thomas* (1978) 20 Cal.3d 457, at pages 467 to 468 [143 Cal.Rptr. 215, 573 P.2d 433], the California Supreme Court ruled such impeachment is improper. In *Thomas*, the defendant was charged under Penal Code section 288 with molesting M, his stepdaughter, and R, his natural daughter. The defendant made only a specific denial of molesting M or R, not a "blanket denial" of any prior misconduct. Therefore, the Supreme Court concluded, his denial could not be used as the basis for impeachment by C, another daughter, who testified about the defendant's misconduct with her.

Similarly, Epps made only a specific denial of kissing Linda. He did not make a blanket denial which could provide a basis for impeachment by extrinsic evidence of his kissing Sandra. Additionally, as was said in *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450 [161 Cal.Rptr. 634], involving similar impeachment: "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be thereafter contradicted." (*Id.*, at p. 461.) The trial court erred in admitting this testimony.

## (2) *Charlotte B.*

█ During cross-examination, Epps was asked about Linda's use of the phrase "I always get what I want." He answered. He was then asked if he himself had ever used the phrase. He denied using the phrase and, in apparent exasperation, added "That is not even a part of my vocabulary. I don't say things like that." On the basis of this denial, Charlotte, a former coworker of Epps at another hospital, was allowed to testify that Epps had used those words to her. During her testimony, she described in detail how Epps reached over and cupped her breast, how she reacted with outrage and how, after an exchange of heated words, he said "I get what I want." Epps explained he had touched her breast accidentally and she overreacted. He denied having used the phrase.

Charlotte's statement was admitted as a prior inconsistent statement (Evid. Code, § 1235).[2] It satisfied the requirements of Evidence Code section 770[3] because Epps was given an opportunity to explain or deny. The testimony, however, was prejudicial. Under Evidence Code section 352[4] the trial court has discretion to exclude evidence if its probative value is outweighed by a danger of undue prejudice. It has been acknowledged that in sex offense cases, evidence of prior similar acts should be received with "extreme caution" and the relevancy and admissibility of the evidence must be examined with extreme care (*People v. Thomas, supra*, 20 Cal.3d 457, 466).

The impeaching testimony here involved an act similar to the one charged. The prosecutor initially argued that Charlotte's testimony should be admitted to show defendant used a common scheme or plan as well as to corroborate Linda's testimony. At that time, the trial court

---

[2] Evidence Code section 1235 states: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

[3] Evidence Code section 770 reads: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

[4] Section 352 of the Evidence Code states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

concluded the act was not similar enough (primarily because Charlotte was a nurse, not a patient), and therefore the possible prejudice outweighed the probative value. Just because the testimony is used for impeachment by prior inconsistent statement does not mean the danger of prejudice is removed. Neither is the probative value of Charlotte's testimony strengthened when it is used to attack Epps' credibility. Epps' denial ("that is not even a part of my vocabulary") was an obvious overstatement and, undoubtedly, not given much weight by the jury. Even if Charlotte's testimony of Epps' prior inconsistent statement did have significant probative value, her testimony should have been limited to the statement which actually impeached Epps. The trial court abused its discretion by allowing Charlotte to testify to the dissimilar prior act.

In view of the verdict's reflecting the jury's selective belief in the evidence, we cannot conclude otherwise than that the admission of the Sandra and Charlotte evidence was prejudicial requiring reversal (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]).

### COMMON DESIGN AND CORROBORATION OF LINDA

Debra H. was a 20-year-old voluntarily committed patient in the Centre City Hospital psychiatric ward. She was diagnosed as being manic-depressive and in the manic phase. She was in the midst of a divorce when she entered the hospital. Epps was working in the hospital in "medical-surgical" but "floated" down to the psychiatric ward when they were short of staff.

Debra testified she met Epps through another hospital worker. The three of them talked for awhile on two consecutive nights. Nothing sexual was said either time, but Debra felt very attracted to Epps and felt romance in the air. The second night while Epps was making hourly bed checks, he came into her room and woke her up. She flirted with him. Then he started playing with her breasts and vagina. She responded. When she became nervous they might be seen, they moved into the bathroom to have sex. There was no penetration because Epps ejaculated prematurely. Afterward Epps gave her his phone number.

Epps denied ever having touched Debra. He said Debra and her roommate flirted with him during the bed check. Debra asked him to come in and talk, which he did. He did not give her his phone number.

■ Evidence Code section 1101, subdivision (a),[5] excludes evidence that a defendant, in the past, committed certain acts similar to the offense charged to prove the defendant has a propensity to commit that type of offense. The reasons behind this exclusionary rule have been stated as "(1) to avoid placing the accused in a position in which he must defend against uncharged offenses, (2) to guard against the probability that evidence of such uncharged acts would prejudice defendant in the minds of the jurors, and (3) to promote judicial efficiency by restricting proof of extraneous crimes." (*People v. Thomas, supra,* 20 Cal.3d 457, at p. 464.)

However, Evidence Code section 1101, subdivision (b), allows prior similar acts to be admitted if they are used to show something besides a defendant's propensity to commit the crime charged. Among the recognized purposes is to show a defendant had a common plan, scheme or design in committing the two acts. Usually a common scheme or plan is used to prove a defendant's identity (*People v. Jackson* (1980) 102 Cal.App.3d 620 [162 Cal.Rptr. 574]) or his/her intent (*People v. Jackson* (1980) 110 Cal.App.3d 560 [167 Cal.Rptr. 915]), but it may also be used to corroborate the prosecuting witness' testimony (*People v. Thomas, supra,* 20 Cal.3d 457, 465).

As stated in *People v. Haslouer* (1978) 79 Cal.App.3d 818, 827-828 [145 Cal.Rptr. 234], "[a] common plan, scheme or design is admissible on the premise that if the two offenses are clearly connected, i.e., a sufficiently high degree of common features, the uncharged prior is admissible because it warrants an inference that if the defendant committed the other act, he committed the act charged." *Thomas* delineated the guidelines for determining whether the two offenses are "clearly connected." The prior offense must be (1) not too remote in time, (2) similar to the offense charged, and (3) committed upon a person similar to the prosecuting witness (20 Cal.3d at p. 465).

Applying these guidelines to the facts of this case, we find the trial court did not abuse its discretion.

---

[5]Evidence Code section 1101, subdivision (a), states: "Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion."

(1) Remoteness. The prior act with Debra was not too remote. It occurred approximately seven months before the incidents with Linda began.

(2) Similarity of acts. The strength of inference from the common marks of two acts depends upon (1) the degree of distinctiveness of individual marks and (2) the number of minimally distinctive shared marks (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267]; *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129 [172 Cal.Rptr. 86]). There are distinctive and numerous common marks between the two acts here. The trial judge noted that unique to both acts was they involved "on-the-job" sex—an unusual occurrence. Other points of similarity are both acts occurred in secured psychiatric units, both times were consensual, both times defendant ejaculated prematurely and both times defendant gave his home phone number to the patient.

(3) Similarity of the victims. The victim in the prior act was similarly situated as the prosecuting witness—both were females of tender years, both were psychiatric patients, both were in a vulnerable mental condition and both responded favorably to defendant's advances.

The question of how similar the acts must be, necessary for admission of a prior similar act to show a common scheme or plan, is within the discretion of the trial court. Here, there were sufficient common marks to support the trial court's decision to admit Debra's testimony.

### JURY INSTRUCTIONS

█ Epps contends the judgment should be reversed because the court failed to give, *sua sponte*, CALJIC No. 17.01: "The defendant is charged with the offense of _____ . He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

Epps was charged with and convicted of section 647a,[6] annoying or molesting a minor, on or about the dates between January 1 and Febru-

---

[6] Section 647a reads as follows: "Every person who annoys or molests any child under the age of 18 is a vagrant and is punishable upon first conviction by a fine not exceed-

ary 26, 1979. There was testimony about many separate incidents, any one of which could have constituted a violation of section 647a, e.g., kissing on several occasions, touching her breast, telling her he would run away with her, and fondling her.

At no time prior to argument did the prosecutor make an election as to which act constituted a violation of section 647a. During argument, the prosecutor mentioned that if the jury found the laundry incident involved touching only, i.e., no intercourse, then it would be a violation of section 647a. However, she also argued that Linda and Epps had a continuing relationship with many touching and kissing episodes which violated section 647a.

No demand was made by defense counsel for an election. The court did not give a *sua sponte* instruction that the jurors must agree on a specific act to find Epps guilty. The court did instruct the jury it was not necessary to agree the act took place on a specific date (CALJIC No. 4.71). Thus, the jury, aware that defendant committed several acts, was never told how to select the act which constituted the crime charged, or that it had to be unanimous as to the specific act.

The rule that the entire jury must agree on the act or acts of which the defendant is guilty has a long case history beginning with *People* v. *Castro* (1901) 133 Cal. 11, 13 [65 P. 13]. In a case decided shortly after *Castro, People v. Williams* (1901) 133 Cal. 165 [65 P. 323], where the trial court told the jurors to convict the defendant of statutory rape if he had sexual intercourse with the prosecutrix within three years prior to the filing of the indictment, the Supreme Court said at page 168: "'Each of these acts was a separate offense, and the defendant could be tried for either, and separately for each of them. *The jury were not even told that they must all agree that some specifically described act had been performed.* A verdict of guilty could have been rendered under such an instruction, although no two jurors were convinced beyond a reasonable doubt, or at all, of the truth of the charge, as to any one of these separate offenses. Even worse than that was possible. As to every specific offense which there was an attempt to prove, and which could be met by proof, the defendant may have established his defense, and yet upon the general evidence of continuous crime,

---

ing five hundred dollars ($500) or by imprisonment in the county jail for not exceeding six months or by both such fine and imprisonment and is punishable upon the second and each subsequent conviction or upon the first conviction after a previous conviction under Section 288 of this code by imprisonment in the state prison."

which, in the nature of things, he could only meet by his personal denial, he may have been convicted. And how could he defend when he was not informed as to what particular offense, out of the hundreds testified to by the prosecutrix, he was to be tried? Such a trial, upon a charge so indefinite as to circumstance of time or place, or any particular, except by the general designation, would be a judicial farce, if it were not something a great deal worse.'" (Italics added.) .

Generally, if no election is made as to which act or acts constitute the charged crime, then it is assumed an election was made for the first offense upon which substantial evidence was introduced to constitute the offense (*People* v. *Madden* (1981) 116 Cal.App.3d 212, 217 [171 Cal. Rptr. 897]). However, the jury must be informed of this presumption so it knows which act or acts are being prosecuted (*People* v. *Alva* (1979) 90 Cal.App.3d 418, 424 [153 Cal.Rptr. 644]).

The People contend no election was necessary here because Epps' acts amounted to a continuous course of conduct. This concept of many separate acts resulting in but a single crime is quite limited (*People* v. *Madden, supra,* 116 Cal.App.3d 212, 218). It has been used with statutes susceptible of such an interpretation, e.g., child abuse (*People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299]), failure to provide for a minor child (*People* v. *Morrison* (1921) 54 Cal.App. 469, 471 [202 P. 348]), and pandering (*People* v. *White* (1979) 89 Cal.App. 3d 143, 151 [152 Cal.Rptr. 312]). These are all areas where it is possible a series of acts, which if individually considered, might not amount to a crime, but the cumulative effect is criminal. For example, in child abuse, if the doctor has seen the child only once or with but a single injury, he or she would probably diagnose the injury as the result of an accident. However, if the doctor sees the child a number of times or detects evidence of multiple injuries, then he or she is much more likely to diagnose the child as a victim of the "battered child syndrome." It is the continuing course of abuse which leads to prosecution and conviction.

Separate acts may also result in but one crime if they occur within a relatively short time span (*People* v. *McIntyre* (1981) 115 Cal.App.3d 899, 910 [176 Cal.Rptr. 3]). In *McIntyre,* a forcible rape was followed immediately by forcible oral copulation. The court noted: "The fact that a second forced oral copulation occurred within a few minutes during this sexual attack does not necessarily make this another separate crime any more than it would be true there are separate crimes of battery if the actor throws a right-hand punch to his victim and immediately fol-

lows it with a left-hand punch. Similarly, if only one punch lands on the victim, the law does not require the jury to agree on whether it was the right or the left-hand punch which reached its mark."

In this case, however, the touching and kissing episodes occurred over a period of two months, not minutes, and each act of touching or kissing could have been charged as a separate annoyance or molestation crime under section 647a. This conclusion flows from the fact the words "annoy" and "molest" are synonymously used in section 647a; and, while the conduct designed to disturb or irritate, or to offend, may consist of continued or repeated acts, it is "'the objectionable acts of defendant which constitute the offense'" (*People v. Carskaddon* (1957) 49 Cal.2d 423, 426 [318 P.2d 4]).

The proof in this case shows the child was not "molested" by a series of acts, but by a single act on each occurrence. Just as "[m]ultiple sex acts cannot be held to be continuous conduct on a theory of there being but one act of sexual abuse" (*People v. Madden, supra*, 116 Cal.App.3d 212, 218), so also the multiple occurrences of annoyance or molestation here cannot properly be deemed a single annoyance or molestation. The jury must unanimously agree on which act or acts constitute the offense.

This point was not properly addressed in the court's instructions to the jury which, though correct in definition, merely said: "With regard to Count Two, child molestation, you are instructed that every person who annoys or molests any child under the age of 18 years is guilty of a misdemeanor.

"As used in the foregoing instruction, the words 'annoy' and 'molest' are synonymous and mean to disturb or irritate, especially by continued or repeated acts, to vex, to trouble, to irk, or to offend.

"Conduct which is so lewd that a normal person would unhesitatingly be disturbed or irritated by it is conduct which would annoy or molest within the law stated to you.

"To constitute the offense charged, it is not necessary to establish that the acts or conduct, in fact, disturbed or irritated, vexed or offended the child or that the body of the child was touched.

"To establish the offense charged, it must be proved that the acts and conduct of the defendant were motivated by an unnatural and abnormal sexual interest with respect to children."

The trial court committed reversible error by failing to instruct the jury that they must unanimously agree on which act constituted the crime (see CALJIC No. 4.71.5 and Use Note).

## PRIOR CONSISTENT STATEMENTS

■ Questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection (Evid. Code, § 353; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]).

Defense counsel did make a timely objection to the admissibility of Linda's hearsay statement during Barbara's testimony. The objection was sustained and the jury admonished to ignore Linda's statements to Barbara. There was no error here.

Defense counsel failed to make timely objections during the testimony of Dr. Brown and Detective Dreis. On appeal, it is urged that the continuing objection made during Barbara's testimony should cover the testimony of Dr. Brown and Detective Dreis. This contention is without merit. The hearsay statements were all from separate conversations, the testimony of the witnesses were days apart, and counsel failed to make any sort of continuing objection during a bench conference discussing the admissibility of Linda's prior consistent statements to Barbara. Counsel failed to give the court sufficient notice that he believed there was a defect in the evidence, and thus waived the defect. Furthermore, the content of all these conversations came in during Linda's testimony. The trial court did not err in this regard.[7]

## PROSECUTORIAL MISCONDUCT

During closing argument, the following occurred: "[PROSECUTOR:] When you go into the jury room and you are deliberating, part of the

---

[7]We observe for purposes of any retrial involving similar proof as to Linda's commitment status, should timely and proper objection be made, the trial court must make a preliminary determination of when the motive to fabricate arose in order to make a correct ruling on the admissibility of the past consistent statements (see Evid. Code, §§ 791, 1236).

process is for all of you to deliberate together, to talk it over. [¶] If there is any juror who doesn't do that or refused to do that, then that's something that the court can be made aware of because that is what you are to do. [¶] You don't go in there and just say, 'Well, he's guilty; he's not guilty;' you talk about it. [¶] That's why we have alternates, too. [¶] You people, you reach a point, you feel you will not discuss the case, then that is the time to step out."

The defense objected and the following occurred: "MR. BLEVINS: Your Honor, I am going to object to that kind of an instruction to the jury. [¶] It's almost like a prosecutorial intimidation.

"THE COURT: Well,—

"MISS ROWLAND: I think I have stated it correctly, your Honor. [¶] That's the instruction they get. [¶] I have finished that line, in any case.

"THE COURT: Yes, go on to some other subject. [¶] I am not sure of the accuracy of that statement. However, the court will instruct you more thoroughly on the duties of a juror."

In chambers, the statement was discussed in part as follows: "THE COURT: It seems to me it could be stated a little more diplomatically.

"MISS ROWLAND: I probably should have phrased it a little more diplomatically. [¶] I would say something like, 'If the foreman determines that one of the jurors is not discharging his duty by freely and fairly discussing the facts and the instructions, that fact should be made known to the Court.' [¶] I usually am more diplomatic. I think it was—

"THE COURT: Don't just say, 'Step out of the jury room if you don't want to discuss it.'

"MISS ROWLAND: I really didn't mean it to come out quite that way. [¶] I think that this has been a long case."

The court then offered to cure any seeming problems by an admonition, stating: "THE COURT: Do you want any cautionary instruction along the lines that I just indicated, Mr. Blevins, to cure any problem that might exist? [¶] I can't see any problem.

"MISS ROWLAND: It's fine if—I mean—

"Mr. Blevins: Well, you know, I don't know how you could really change that.

"The Court: How about saying, 'When the Deputy District Attorney, in closing argument, stated that a juror who does not want to discuss the case should step out of the jury room, that she meant to convey the thought that the jury should report to the Court any difficulty encountered with any juror who does not really discuss the facts and the instructions'?

"Mr. Blevins: I think we better leave it like it is."

■ "Prosecutorial misconduct implies the use of deceptive or reprehensible methods of attempt to persuade either a court or jury" (*People v. Strickland* (1947) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]). It is not necessary to show bad faith, but it is necessary to show the defendant's right to a fair trial was prejudiced by the remark (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396]). Such was not the case here. Immediately following the remark, the court expressed some doubt about the appropriateness of the statement and stated it would give the jury fuller instructions. This admonishment plus the complete jury instructions assured the prosecutor's singularly inappropriate statement did not prejudice the defendant, and in any event, considering defense counsel's willingness to "leave it where it is," there is doubt he made a sufficient request for an admonition curing the harm to preserve the issue for appeal (see *People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]).

CONCLUSION

The judgment is reversed.

Staniforth, J., and Wiener, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 13, 1981.