[No. H003582. Sixth Dist. Mar. 1, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK BEVAN, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Patricia Watkins, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Joyce E. Kahee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COTTLE, J.**—Appellant Mark Lester Bevan was convicted by jury of three counts of lewd and lascivious acts upon twelve-year-old Karen C. (Pen.

Code, § 288, subd. (a).) As to each count the court ordered Bevan placed on formal probation for a period of three years with six months in the county jail as a condition of probation. On appeal he contends, inter alia, that he committed a single offense which was improperly fragmented into three separate offenses; in the alternative, he argues that Penal Code section 654 requires a stay of any sentence imposed on two of the three counts. We conclude that a single crime was committed here, and that the conviction as well as the punishment for the two duplicate crimes must fall.

I

FACTS

On July 18, 1986, Karen C., age 12, lived with her family at the Sun Tree apartment complex in Milpitas. Her mother, the apartment manager, had hired Atlas Security to provide guards for the complex. Bevan was employed as a security guard by Atlas; Karen had known him for about a month as a result of his employment at Sun Tree. On this particular date, Bevan was assigned to patrol the Indian Hills apartment complex adjacent to Sun Tree. However, his employer asked him to meet another security guard, Sherri Boone, at Sun Tree to assist in training a new employee. Boone was a friend of Bevan's sister and had known Bevan for five years. Both Boone and Bevan testified they had never dated or been romantically involved.

Karen C. had plans to spend the night of July 18th with Denise B., a teenage friend who lived in a nearby apartment. According to Karen, between 7 and 8 p.m., the two girls accompanied Bevan to get a pizza. The three returned with a pizza about 7:30 p.m. and took it to the Indian Hills rental office where they were joined by one of Bevan's friends. Shortly thereafter, when Karen and Denise prepared to return to Denise's apartment, Bevan said, "You're going to leave me here alone." The girls agreed to come back later.

Karen and Denise ate dinner together but then Denise had to leave. Karen walked back to Indian Hills sometime after 9 p.m. where she ran into Bevan talking with some boys near the pool. Bevan suggested that he and Karen walk around together. She accompanied him on his rounds, following him as he locked up the laundry rooms. Bevan then told her that he wanted to go behind a particular building on the grounds "to see if anything was back there." It was dark outside and the area behind the building was not lit. They went behind the building and Bevan sat down. Karen sat down a couple of feet away. Bevan moved to within six inches of her and gave her a "French kiss" with his tongue. Karen pulled her head back and stood up

whereupon Bevan stood and picked her up by the waist until they were face to face with her feet off the ground. He kissed her again with his tongue, put her down, and put both of his hands up her shirt, sliding them under her bra and touching her breasts for about half a minute. He then grabbed her wrist and placed her hand on his erect penis. Karen caught a "slight glance" of Mark's exposed penis and then turned her head.

When Karen said she had to go, Bevan offered to walk her home. He told her not to say anything about the incident. They walked together to the parking lot in back of her apartment building. They ran into Sherri Boone, and Karen left as Bevan and Boone spoke to each other.

Crying and upset, Karen went to Denise's apartment where she told Denise what had happened. Karen's mother came over and, according to Karen, Karen then repeated what had taken place. They walked to the mother's office and called the police.

Karen acknowledged she drove Bevan's car on one occasion a couple of days prior to the incident. He had allowed Denise to drive the car in the parking lot and, in turn, Denise let Karen drive it. Karen had then asked Bevan if she could drive his car but he refused. She denied being angry at Bevan over his refusal to let her use the car.

Karen's mother testified that at some previous time Bevan told her that Karen was "nice looking." She had informed Bevan of Karen's age. Bevan also mentioned to her that Karen had been "bugging him" about driving his car. On the night in question, Karen's mother had given Karen permission to stay overnight at Denise's and to go get pizza with Denise and Bevan. Sometime after 11 p.m. Karen's mother stopped to check on the girls as she made her rounds. She saw Karen and Denise outside Denise's apartment; Karen was crying and upset. She asked Denise why Karen was upset. Denise urged Karen to explain but Karen refused. The girls came to her office an hour later, Denise again telling Karen to report the incident to her mother. Karen then related how Mark put his hand on her breasts and put her hand in his pants. Karen added that she was afraid because Bevan had insisted on walking her home, warned her not to tell anyone, and reminded her he carried a gun. Karen also told her mother that she had told Sherri Boone what had taken place but that Boone did not believe her.

Milpitas Police Officers Borck and Watanabe responded to Mrs. C.'s call shortly after midnight. After interviewing Karen and her mother separately, Borck called Bevan's employer who in turn contacted Bevan and asked him to go to the police station to straighten things out. Bevan arrived at the station between 1:30 and 2 a.m. on July 19, 1986.

Confronted with Karen's accusation, Bevan first denied any involvement. Borck informed Bevan of his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights about 45 minutes into the interview when he realized Bevan was nervously fidgeting and answering questions before Borck had time to finish asking them. After waiving his *Miranda* rights, Bevan initially continued to deny involvement. At some point during the interview Borck asked to see Bevan's address book to verify Denise's claim that her name was in it, which it was. Bevan then threw up his hands and with a heavy sigh, said, "Fuck it, I'll tell you the truth, I fucked up." According to Borck, Bevan then admitted he went behind a building with Karen, kissed her, and placed his hands under her shirt. Borck terminated the interview and placed Bevan under arrest.

Bevan testified on his own behalf that at approximately 6 p.m. on July 18, 1986, he left Indian Hills and went to Sun Tree where he met his friend and coworker Sherri Boone and a new trainee. About 7:30 p.m. Karen walked over to talk to them. When that conversation ended, he and Karen continued talking for another 15 minutes. At 8 p.m. he heard Karen ask her mother for permission to go get pizza. According to Bevan, just he and Karen went for the pizza. When they returned they shared some of it with Boone and the trainee at Sun Tree and then took the remaining pizza to Indian Hills where they were joined by Bevan's friends. Thirty minutes later Karen left to return to Sun Tree. Bevan returned to Sun Tree at about 9:45 p.m. to meet Boone; they talked together for about 15 minutes.

Bevan claimed to have next seen Karen as he walked over to lock the laundry rooms at Indian Hills. He ran into her coming out of the Indian Hills apartments. He denied having invited her to accompany him on his rounds. Karen did come with him to the laundry area and helped close windows. Afterwards, he sat down on a grassy curb in a lit parking lot to rest. Karen stood for about a minute, then sat down and, for the third time that evening, asked to use his car. When he raised his voice and told her she couldn't drive the car, she looked "pretty upset" and "like she wanted to kiss or something." He gave her a "peck on the cheek," put his hand on her side in order to balance himself as he rose from a seated position, and told her he was going to walk her home. He denied putting his hands on her breasts.

Bevan walked Karen to Sun Tree where they met Boone. When Bevan started a conversation with Boone, Karen walked off. While he and Boone were talking, Denise, who was with a young man named Kurt, came up to them. Bevan spoke with Denise for two or three minutes; he first learned of Karen's accusations during that conversation. He never thought to go see Mrs. C. to clear up the accusations before leaving for home that evening.

Bevan testified that after Borck saw Denise's name in his address book, he did say, "Fuck it, I'll tell you the truth, I fucked up." However, he claims to have then told Borck he gave Karen a peck on the cheek and touched her on her side. He denied telling Borck he put his hands under her shirt.

Bevan believed Karen made false accusations against him because she was angry he would not allow her to drive his car. He could not explain why Officer Borck would falsify his report to accuse him of admitting having put his hands under Karen's shirt.

Bevan, his sister, and the manager of Indian Hills testified that Bevan was not wearing a gun on the date in question. Bevan admitted having borrowed his employer's gun once or twice before the incident but denied ever wearing it while working at Indian Hills. He wore the gun in a holster on his right side when he did borrow it.

Sherri Boone testified for the defense that at 7 p.m. on July 18, 1986, she saw Karen, Denise, and Kurt while making her rounds. She saw Bevan several times that evening between making security checks at their respective apartment complexes. According to Boone, when she saw Karen and Bevan at about 10:10 that night, Bevan was not wearing a gun and Karen did not appear to be upset. After Karen walked away, her conversation with Bevan was interrupted by Denise, who addressed Bevan in a "loud, snappy voice" for about three minutes. Karen stood watching that conversation approximately 20 feet behind them.

Boone stated while making her rounds she later encountered Denise, Karen, and Kurt talking together. Boone asked Karen to step away to talk with her privately. She cautioned Karen that her accusations were serious and that "she shouldn't play games." Karen said she was not playing games, that Bevan had done what she said. In response to Boone's questioning, Karen acknowledged she planned to tell her mother. Boone went on with her rounds and eventually went to Mrs. C.'s office to complete her evening report. Boone claimed to be at the office when Denise and Karen arrived, that neither girl was crying at the time, that Denise did all the talking, that at no point did Karen make an accusation against Bevan, and that Karen only cried after her mother indicated she was going to call the police.

On rebuttal, Sandra Schoell, a resident at Sun Tree, testified that at about 8:30 on July 18, 1986, she saw Bevan and Boone walking in front of her in the complex's parking lot. They were laughing, talking, and holding hands. Bevan was wearing a gun in a holster on his right side. Her out-of-town

friend commented on the gun and questioned why the apartment complex had security with guns.

Nancy Townsend, assistant manager of Sun Tree, also testified on rebuttal. She had seen Bevan wearing a gun on two occasions while employed as a security guard at the complex. Bevan's employer testified he had loaned Bevan his .357 magnum and that 80 percent of the time he saw Bevan he was wearing the gun.

## II, III*

. . . . . . . . . . . . . . . . . . . .

## IV

 Bevan contends the facts establish that one offense rather than three had been committed. We agree that a single crime has been fragmented into multiple offenses, that such proliferation of a single criminal act into multiple offenses is impermissible, and that the conviction as well as the punishment for the two duplicate crimes must fall. (*People v. Schroeder* (1968) 264 Cal.App.2d 217, 228 [70 Cal.Rptr. 491]; *People v. Harris* (1977) 71 Cal.App.3d 959, 969 [139 Cal.Rptr. 778].)

As we have mentioned above, Bevan was charged with three counts of lewd conduct with a child under the age of fourteen in violation of Penal Code section 288, subdivision (a).[3] "Under its terms, an accused can violate this section either by committing some other Penal Code offense, such as rape (§ 261), unlawful sexual intercourse (§ 261.5), sodomy (§ 286), or oral copulation (§ 288a), or by committing some other undefined lewd act upon the child. [Citation.] Although the lewd act may consist of some other sexual offense, it must he accompanied in all cases 'with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of [the perpetrator] or [the] child.' (§ 288, subd. (a).) Consequently, '[t]his provision can be violated only when a lewd act is committed with the required specific intent.' (*People v. Pearson* (1986) 42 Cal.3d 351, 355 [parallel citations and footnote omitted]." (*People v. Hammon* (1987) 191 Cal.App.3d 1084, 1091 [236 Cal.Rptr. 822].)

 Count one charged Bevan with placing his hands under Karen's shirt and bra and touching her breasts. Count two charged him with kissing

---

*See footnote, *ante,* page 393.

[3] Unless otherwise indicated all further references are to the Penal Code.

Karen on her lips. Count three charged him with grabbing Karen's hand and placing it on his exposed penis. None of this conduct constitutes "some other Penal Code offense." The question is whether each of these contacts described by Karen can properly support a separate violation of section 288, subdivision (a).

Bevan contends that his course of conduct toward Karen would not constitute separate offenses under the test set forth in *People v. Hammon, supra,* 191 Cal.App.3d 1084.

In *Hammon,* the court articulated guidelines to determine when identical sexual acts committed in one transaction may be properly treated as discrete crimes. After reviewing some of the relevant case law, the *Hammon* court determined that "identical sexual acts constitute separate and discrete crimes when they are separated (1) by the commission of a different sexual offense, (2) by sexual climax, (3) by an appreciable passage of time, or (4) by a reasonable opportunity for reflection." (191 Cal.App.3d at p. 1099, fn. omitted.) In formulating its rule, the *Hammon* court was forced to disagree with the analysis in two earlier Court of Appeal decisions, namely *People v. Clem* (1980) 104 Cal.App.3d 337 [163 Cal.Rptr. 553] and *People v. Marks* (1986) 184 Cal.App.3d 458 [229 Cal.Rptr. 107].

We agree with Bevan that his behavior towards Karen would not constitute separate acts of lewd and lascivious conduct under the *Hammon* test. However, the propriety of the *Hammon* test is currently pending before our Supreme Court in *People v. Harrison*█ (Cal.App.) and we do not consider ourselves bound by its general guidelines for all types of sexual acts. We simply note that the *Harrison* case, as well as *Marks* and *Clem,* deal with the issue whether each separate act of penetration constitutes a separate rape or sodomy. In holding that separate acts of penetration constitute separate acts of rape, the *Clem* court stated: "Under Penal Code, section 261 rape is an act of sexual intercourse. Any sexual penetration, however slight, is sufficient to complete the crime. (Pen. Code, § 263.)" (*People v. Clem, supra,* 104 Cal.App 3d at p. 347, italics omitted.) While we share the *Hammon* court's concern with the problems posed by the "penetration rule," we find the rule articulated in *Hammon* overbroad and even less appealing. Since the Supreme Court is poised to rule on this question, we need not express a comprehensive view of the issue. In any event, the "penetration rule" has no relevance to the resolution of issue of multiple offenses under the facts before us.

Instead, we face the difficult issue of deciding when "all of the section 288 charges against a defendant are based on so-called 'undefined lewd acts'"

are there circumstances in which those undefined lewd acts "must appropriately be viewed as part and parcel of a single offense." (*People* v. *Bothuel* (1988) 205 Cal.App.3d 581, 591 [252 Cal.Rptr. 596].)

In *Hankla* v. *Municipal Court* (1972) 26 Cal.App.3d 342 [102 Cal.Rptr. 896] the First District dealt with a similar issue. There the district attorney charged three separate counts of contributing to the delinquency of a minor (Pen. Code, § 272) for one related course of conduct. The first count charged the specific conduct of causing the minor " 'to place his hand on the penis of the defendant,' " the second charged the defendant with soliciting the minor " 'to participate in an act of oral copulation of the defendant's penis,' " and the third count charged that the defendant " 'did take down his pants and expose his person' " to the minor. (*Id.,* at p. 349.) The First District Court of Appeal ruled that the defendant "could not be convicted for three counts of the same offense for one related course of conduct with one victim." Significantly, in so ruling, it reiterated its previous ruling in *People* v. *Cline* (1969) 2 Cal.App.3d 989 [83 Cal.Rptr. 246], that " ' "technical fragmentation" ' of a course of lewd and lascivious conduct could not be resorted to in order to create multiple sexual offenses" and that "[u]nder such circumstances not only the multiple punishment, but also the multiple conviction must be set aside." (*Hankla* v. *Municipal Court, supra,* at p. 358.)

In *People* v. *Epps* (1981) 122 Cal.App.3d 691 [176 Cal.Rptr. 332], the Fourth District held that, because there was testimony about many separate incidents of unlawful touching, any one of which could have constituted annoying or molesting a child under the age of 18 (Pen. Code, § 647a), the court erred by failing to instruct the jury that it must unanimously agree on which act constituted the crime. In so ruling, the court specifically found that the minor had not been molested by a series of acts on one occasion; instead, "the touching and kissing episodes occurred over a period of two months, *not minutes,* and each act of touching or kissing could have been charged as a separate annoyance or molestation crime under section 647a." (*Id.,* at p. 703, italics added.) In distinguishing its facts from the situation of repeated unlawful touchings within a single time frame, the court noted that separate acts may "result in but one crime if they occur within a relatively short time span [Citation]." It pointed out that there are not two separate crimes of battery " 'if the actor throws a right-hand punch to his victim and immediately follows it with a left-hand punch.' " (*Id.,* at pp. 702-703, citing *People* v. *McIntyre* (1981) 115 Cal.App.3d 899, 910 [176 Cal.Rptr. 3].)

Several cases hold that a defendant can be properly convicted and sentenced both for lewd and lascivious conduct and for a sexual offense such as rape, oral copulation, or sodomy when the "lewd conduct was not necessary for or incidental to the commission of his other offenses. [Citation.]" (*People*

v. *Blevins* (1984) 158 Cal.App.3d 64, 72 [204 Cal.Rptr. 124].) While these cases are not directly on point, none of them suggest fragmenting the independent course of lewd and lascivious conduct into separate offenses for each unlawful touching that did not in and of itself constitute a crime. (*People* v. *Blevins, supra* [kissing on the face and breasts charged as one count of § 288, subd. (a) in conjunction with a charge of rape]; *People* v. *Slobodion* (1948) 31 Cal.2d 555, 562 [191 P.2d 1] [placing defendant's hands and private parts upon the bare body and private parts of victim charged as one count of § 288, subd. (a) in conjunction with a charge of oral copulation]; *People* v. *Akers* (1956) 143 Cal.App.2d 224 [299 P.2d 398] [kissing victim's lips, sucking his nipples, and hugging his body charged as one count of § 288, subd. (a) in conjunction with a charge of oral copulation]; *People* v. *Loignon* (1958) 160 Cal.App.2d 412 [325 P.2d 541] [turning victim on his stomach, putting finger in his "bottom," chewing his ear and spanking his leg charged as one count of § 288 in conjunction with a charge of oral copulation].)

In *People* v. *Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63], the defendant, during an uninterrupted period of some 45-60 minutes, subjected his victim to a "brutal sexual attack" in which he "orally copulated her, committed sodomy on her, forced her to orally copulate him, had vaginal intercourse with her, forced her to orally copulate him again, and then again had vaginal intercourse with her. He also forcibly inserted a metal tube into her rectum and vagina." (*Id.,* at p. 549.) The court held that the defendant was properly convicted and sentenced for each separate sexual act/offense, reasoning that "[a] defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*Id.,* at p. 553, citing *People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135] [separate burglaries of different offices within the same building] and *People* v. *Massie* (1967) 66 Cal.2d 899, 908 [59 Cal.Rptr. 733, 428 P.2d 869] [a series of robberies against different individuals].) In *Perez,* as in *James* and *Massie,* the court was reviewing a course of conduct which consisted of a series of separate crimes, unlike the situation here, where none of the unlawful touching which took place was a separate crime from the offense of lewd and lascivious conduct towards a minor.

"Section 288 of the Penal Code was enacted to protect children from the lustful advances and tamperings of callous and unscrupulous persons as well as from the assaults of depraved unfortunates." (*People* v. *Hobbs* (1952) 109 Cal.App.2d 189, 192 [240 P.2d 411].) We do not propose to articulate a general rule on fragmentation applicable to each case where a defendant

commits a course of lewd and lascivious conduct toward a minor. Applicability of the doctrine of fragmentation, just as applicability of the rule prohibiting multiple prosecution should not depend on abstract definitions of the elements of the offense or on the precise moment when, as a matter of law, one act was completed. What matters is the totality of the particular facts, examined in the context of the overall purpose of the rule prohibiting technical fragmentation. (See *People* v. *Flint* (1975) 51 Cal.App.3d 333, 336 [124 Cal.Rptr. 269].)

We do observe, however, that fragmenting a single, brief course of lewd and lascivious conduct into separate offenses could lead to absurd results. As the offender moved his hands over various parts of the child's body, such as the neck, breasts, ears, lips, toes, thighs, etc., theoretically each touch could result in a separate charge, resulting in dozens of charges from a momentary single contact with the minor. The Legislature has not specifically defined the word "act" in terms of a violation of section 288, subdivision (a) so as to clarify whether each touch in a series of associated acts with a minor which is not a separate crime in and of itself qualifies as a separate unit of prosecution. Whether section 288, subdivision (a) permits the facts before us to be prosecuted as three separate offenses rather than one single offense cannot be ascertained from the language of the statute; "argumentative skill . . . could persuasively and not unreasonably reach either of the conflicting constructions." (*Bell* v. *United States* (1955) 349 U.S. 81, 83 [99 L.Ed. 905, 910, 75 S.Ct. 620].)

In deciding that the facts before us must be treated as a single offense of lewd and lascivious conduct, we adopt the analysis of the United States Supreme Court in *Bell*: ■ "When [the Legislature] has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When [the Legislature] leaves to the Judiciary the task of imputing to [the Legislature] an undeclared will, the ambiguity should be resolved in favor of lenity. . . . [D]oubt will be resolved against turning a single transaction into multiple offenses, when we have no more to go on than the present case furnishes." (349 U.S. at pp. 83-84 [99 L.Ed. at pp. 910-911].)

**(1c)** The conviction and sentence for the two duplicative counts of section 288, subdivision (a) are reversed. The remaining one count of

section 288, subdivision (a) is affirmed. The trial court is directed to prepare and file an amended abstract of judgment to reflect the modified judgment.

Capaccioli, Acting P. J., and Premo, J., concurred.