941 A.2d 1161

**Devin HOERAUF**

v.

**STATE of Maryland.**

**No. 195, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 8, 2008.

294

Rachel M. Kamins (Bennet & Bair, LLP, on the brief), Greenbelt, for appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Attorney General, on the brief), Baltimore, for appellee.

Panel: JAMES R. EYLER, SHARER, and WOODWARD, JJ.

WOODWARD, J.

On November 22, 2006, a jury sitting in the Circuit Court for Montgomery County found appellant, Devin Hoerauf, guilty of four counts of robbery. On appeal, appellant presents four questions for our review, which we have rephrased:

1. Did the trial court err in denying the motion to suppress appellant's statement to police?

2. Did the trial court abuse its discretion in removing juror number 8?

3. Did the trial court commit plain error by failing to take any action when the State commented on appellant's demeanor during rebuttal closing argument?

4. Did the trial court abuse its discretion in propounding the pattern jury instruction on flight?

We shall answer "yes" to question 4 and reverse and remand for a new trial. For the benefit of the trial court on remand, we will address question 1, because it relates to the admissibility of appellant's statement to the police. A new trial, however, obviates the necessity of answering questions 2 and 3.

### BACKGROUND[1]

This case arises out of an incident that took place on June 13, 2006. Kyle Phillips, who was sixteen years old at the time, testified at trial that in the early afternoon of June 13, 2006, he was at the MARC station in Germantown with his friends, Jonathon Bruff, Matthew Pedmonte, Thomas "Tony" Rouse, Gary Schneider, and Ryan Schneider. They were BMX biking, or "[t]rick riding." When another group of individuals walked by, one of them turned around and asked Phillips and Pedmonte: "Do you have a dollar?" Phillips testified that he

---

1. Because appellant does not challenge the sufficiency of the evidence supporting his convictions, we will set forth only those facts that are necessary for our discussion of the questions presented.

responded: "No, do you have a dollar?", after which members of the other group "started getting hostile," saying "so you want to fight us[?]"

Phillips recounted that the group of individuals left Phillips and his friends, but returned ten or fifteen minutes later in a larger group, now comprising about ten individuals. The group approached Phillips and walked up to the bikes, "say[ing] stuff like these are nice bikes, and start[ing] to pick them up." When someone picked up one of the more expensive bikes, Phillips "said something" and "then [ ] got hit." Phillips identified appellant as one of the individuals in the larger group.

According to Phillips, although appellant was with the others in the larger group, Phillips did not see appellant strike anyone directly. During the fight, however, when one of the victims picked up a wrench, appellant walked towards him, "like he was going to hurt him," and said, "you put that wrench down now" in a "very threatening way." The fight lasted for about five or ten minutes, after which the group of individuals started to walk away with the bikes belonging to Phillips and his friends. Phillips testified that appellant "was one without a bike." Gary Schneider, according to Phillips, asked appellant: "Hey, can we get our bikes back[?]," to which appellant replied: "I don't know what I can do about it, but I'll see." [2] Appellant walked off towards the group and was seen talking to them. The bikes were not returned.

James Roberts testified that on June 13, 2006, he was with Maurice Graham and Steve Yax while they were on their way to 7–Eleven to meet appellant, after which they were going to take the bus to Lake Forest Mall. Roberts, who was fifteen years old at the time, was the individual who asked Phillips for a dollar, the cost of the bus fare to the mall. Phillips' response made Roberts angry, but all three proceeded to walk away from Phillips and his friends. When they got to 7–

---

**2.** Gary Schneider testified, however, that appellant "simply said, 'No, it's out of my hands.' "

Eleven, Yax told appellant, who was with his girlfriend, what happened and all five individuals walked back to the MARC station. Roberts testified that he did not see appellant during the fight. When they left the fight, Roberts testified that he remembered looking behind him and seeing appellant walking with his girlfriend. According to Roberts, about ten or fifteen minutes after the fight, the group was stopped by the police. In a statement to police, admitted into evidence at trial, Roberts stated that he and the others, including appellant, were involved in hitting the victims.[3] Roberts also told police that the victims were ordered to empty their pockets.

The group took two bikes and threw Phillips' bike over a bridge onto the railroad tracks below. In addition to the damage to his bike, Phillips had his wallet, which contained $10, taken from his back pocket during the fight. When the wallet was recovered, the $10 was missing. Rouse's cell phone, MP3 player, and wallet, which did not contain any money, were taken from him. The group also took $15 in cash and a $50 Best Buy gift card from Pedmonte.

Police caught up with appellant, Roberts, Yax, and Graham as they were walking through a nearby neighborhood to Lake Forest Mall. Other officers arrived with the victims to conduct a showup identification. The victims positively identified appellant and the three other individuals. A MP3 player, apparently belonging to Rouse, was found in Yax's pants pocket.

At the police station, appellant provided the following statement, which was introduced at trial:

I called Steve Yax, a black Spanish male, long hair, braids, on my phone. He told me to meet him at the 7–Eleven in Germantown. I took the bus and met him. He wasn't at the 7–Eleven.

I went to the train station and met Steve Yax. Steve asked me if I wanted to wreck.[4]

---

**3.** Gary Schneider also testified that he thought that the entire group was engaged in the fight.

**4.** "Wreck" meant "to fight" according to appellant's explanation of the term.

\* \* \*

Steve told me he asked some young dude on the bike for a dollar. The dude got smart with Steve so Steve wanted to fight. I walked up to the 7–Eleven with Steve and saw the kids Steve was talking about. They were on bikes.

Steve and the other guys I was with started fighting. I walked off. I walked up to the Rolling Hills with Steve. I don't know the other two kids I was with. They were black males. I guess they were friends of Steve's. One girl was with us. I don't know her name.

Steve was talking about robbing people. He talks about robbing Hispanics because they have money and get drunk.

We will set forth additional facts and proceedings below as necessary to discuss the questions presented.

## DISCUSSION

### I.

#### Suppression Hearing

At the suppression hearing, Detective Mike Sofelkanik of the Montgomery County Police Department testified that on June 13, 2006, he met with appellant, who was seated in an interrogation room in the office of the Germantown Investigative Station.[5] During his testimony, Detective Sofelkanik was questioned about what took place when he entered the room:

[THE PROSECUTOR]: Okay. When you initially identified yourself, what did you tell him with regard to why you were there and why he was there?

[WITNESS]: I identified myself as a detective with the Montgomery County Police and that I wanted to discuss why he was there. He understood that he was under arrest and I wanted to—I told him I was a finder of facts and I

_____

**5.** Detective Sofelkanik did not make the arrest of appellant. Appellant was arrested by patrol units and an officer from patrol put appellant in the interrogation room.

just wanted to hear if he had anything to say, and if he wanted to talk to me.

[THE PROSECUTOR]: And how did he respond to that?

[WITNESS]: He agreed to speak to me, and then I advised him that prior to giving me any specifics on the case, I needed to advise him of his constitutional rights.[6]

* * *

[THE PROSECUTOR]: Can you walk us through—you've introduced yourself, you told him he was under arrest, that you were going to try to find some facts and then you begin to do what?

[WITNESS]: After he was aware of who I was and he felt, what I thought felt, comfortable and he knew who I was and kind of an ice breaker. Just to let him know that I was not the arresting officer. That he was there, that I would like to speak to him and he felt comfortable. It seemed like he was comfortable. I then advised him that I could not ask him any questions in reference to the case prior to reading him his Advice of Rights form.

[THE PROSECUTOR]: Okay, and how did he respond to you at that point in time?

[WITNESS]: He said—basically I read the rights to him and he responded in a normal—

[THE PROSECUTOR]: Okay, would you—

[WITNESS]:—fashion. Nothing out of the ordinary.

* * *

[DEFENSE COUNSEL]: All right. Now when—you testified on direct examination, number one that you told him that you were a "fact finder"?

[WITNESS]: Yes.

---

6. Appellant did not ask Detective Sofelkanik any questions about why he was there.

[DEFENSE COUNSEL]: Okay, and that was before you read him the rights. Is that correct?

[WITNESS]: Yes.

\* \* \*

[DEFENSE COUNSEL]: Didn't you tell [the prosecutor], on direct examination, "I said I was a fact finder. I asked him if he wanted to speak to me. He said yes. And then I read him his rights." Didn't you say that on direct examination?

[WITNESS]: I asked him why—I asked him that [sic] I was there, I was a "fact finder" and that my job was a detective and I had to read him these rights prior to asking him any questions about the event. Now as far as talking to him and asking if he wanted to talk to us prior to reading him that? It's very possible I said that, yes.

[DEFENSE COUNSEL]: Okay, all right, and he said, "Yes" when you asked him if he wanted to talk to you. That's what you said to [the prosecutor] on direct right?

[WITNESS]: Okay.

Detective Sofelkanik also testified as to the rights he read appellant:

[THE PROSECUTOR]: Detective, would you demonstrate for the Court how it is you advised [appellant] of his rights on June 13, 2006.

[WITNESS]: Yes. . . . He's sitting across from me at a table and I advised him prior to me questioning him. I was required to advise him of his constitutional rights. That basically that I'm not allowed to ask you any questions until I advise you of the following directions.

And I asked him if he understood that. He verbally stated that he did and then I proceeded to—and we have a form, it's the Advice of Rights, it's the MCP–50 form. We don't stray from that. It's the same form that we use every time in Montgomery County.

According to Detective Sofelkanik, he read appellant his rights "right from the form." [7] It appeared to the detective that appellant understood his rights, and when he specifically asked whether appellant understood what was just said to him, appellant responded, "Yes." [8] Detective Sofelkanik did not recall that appellant ever asked him to explain anything. When the detective finally asked appellant, "[D]o you want to talk to us at this time[?]," appellant responded, "Yes." Thereafter, both Detective Sofelkanik and appellant signed the form. Detective Sofelkanik also put his initials next to each question that he read to appellant.

Regarding appellant's right to an attorney during questioning, Detective Sofelkanik testified that appellant said that "[h]e did not want an attorney. He agreed to speak to us." When questioned, the detective further explained:

[THE PROSECUTOR]: Did he at any time during the course of your reading him his is [sic] MCP–50, State's Exhibit No. 1 the Advice of Rights, or at any time thereafter, invoke his right to remain silent?

[WITNESS]: No, and again if he would ask for an attorney, at that point I would not continue the interview; I'm required to provide him with an attorney.

[THE PROSECUTOR]: Did he agree to answer your questions without an attorney being present?

[WITNESS]: Yes. He did.

---

**7.** In his testimony, Detective Sofelkanik read seven "question[s]" listed on the Advice of Rights form: (1) "you have the right now or anytime to remain silent," (2) "anything you say may be used against you," (3) "you have the right to a lawyer before and during any questioning," (4) "if you cannot afford a lawyer one will be appointed for you," (5) "you have the right to be taken promptly before a District Court Commissioner who is a judicial officer not connected with the police" who will "inform you of each offense you are charged with and the penalties of each offense . . . .," (6) "do you understand what I have just said," and (7) "do you want to talk to us at this time."

**8.** Detective Sofelkanik testified that "the reason I know he said, 'Yes' is because I write down exactly what they say and it's procedure that we have to verbally hear something from their mouth and [appellant] responded, 'Yes' to the answer."

Detective Sofelkanik testified that, after reading appellant the form, he wrote as appellant dictated a statement of what occurred on June 13, 2006. He testified further that after the statement was transcribed, appellant made a few corrections that both he and appellant initialed. Appellant then signed each page of the two-page statement.

Appellant testified that he was first handcuffed to a table and fingerprinted, and then placed in a holding cell for several hours prior being escorted to the interrogation room. According to appellant, when he was seated at a table during fingerprinting and while in the holding cell, he requested to call his mother, an attorney:

[DEFENSE COUNSEL]: Now when you were seated at the table where they were taking fingerprints, did you make any requests to anybody in the police station? This is before you went into the holding cell. Did you make any requests to anybody about anything?

[WITNESS]: Just to call my mother.

[DEFENSE COUNSEL]: And who [sic] did you make that request to?

[WITNESS]: One of the officers, I'm not sure—I don't remember the names or anything.

[DEFENSE COUNSEL]: Did you mention to one of those officers that your mother was a lawyer?

[WITNESS]: Yes.

[DEFENSE COUNSEL]: And what did the officer say?

[WITNESS]: That I'm supposed to wait until after I go to CPU and see the commissioner and such.

[DEFENSE COUNSEL]: How many times did you mention that, that you wanted to call your mother or you wanted them to call your mother before you were put in the holding cell?

[WITNESS]: Several times.

[DEFENSE COUNSEL]: All right. In the holding cell, did somebody come to talk to you while you were still in there?

[WITNESS]: Yeah, one of the officers.

[DEFENSE COUNSEL]: Okay, was it the same one that took the fingerprints?

[WITNESS]: I'm not—

[DEFENSE COUNSEL]: Pardon?

[WITNESS]: I'm not sure.

[DEFENSE COUNSEL]: Okay. Did you talk to that person that came to see you in the holding cell?

[WITNESS]: No, I just asked him some questions.

[DEFENSE COUNSEL]: What questions did you ask him?

[WITNESS]: Like what was going on, and am I allowed to leave. Like, if everyone in the place says I didn't do anything, because I didn't do anything, they would let me out right there and she said, "No." And then I asked to call my mother—

[DEFENSE COUNSEL]: What's that?

[WITNESS]: And then I asked to call—mother's a lawyer and they said they can't do anything.

[DEFENSE COUNSEL]: All right, and that's when you were in the holding cell?

[WITNESS]: Uh-huh.

[DEFENSE COUNSEL]: Is that a "yes"?

[WITNESS]: Yes.

On cross-examination, appellant testified that he could not remember whether he asked Detective Sofelkanik for his mother, an attorney, while he was in the interrogation room:

[THE PROSECUTOR]: So when Detective Sofelkanik comes in, Detective Sofelkanik comes in, right, he introduced himself to you?

[WITNESS]: Yeah.

[THE PROSECUTOR]: The detective that just testified?

[WITNESS]: Yeah.

[THE PROSECUTOR]: Okay. Did you tell him you wanted to speak to your mother?

[WITNESS]: Possibly, I don't really remember.

[THE PROSECUTOR]: You don't remember, do you?

[WITNESS]: I tried to block it out I guess. It was an unpleasant memory.

[THE PROSECUTOR]: You don't know who you told that you wanted to speak to you [sic] mother; you don't know when you told them you wanted to speak to your mother and you wanted to speak to your mother because she's your mother, is that right?

[WITNESS]: Yeah, and also she's a lawyer.

When questioned as to whether the officer informed appellant of his rights, appellant stated, "[n]ot in particular. He probably did though." Appellant testified that he signed and initialed the statement dictated to Detective Sofelkanik and conceded that the detective was telling the truth that appellant reviewed and made changes to his statement.

### A.

### *Standard of Review*

When reviewing a circuit court's disposition of a motion to suppress evidence, we "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129 (2007). " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " in this case, the State. *Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072 (2007) (quoting *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003)). We defer to the trial court's factual findings and uphold them unless they are shown to be clearly erroneous. *Id.* We also make our " 'own independent constitutional appraisal,' " by reviewing the relevant law and applying it to the facts and circumstances of this particular case. *Longshore,* 399 Md. at 499, 924 A.2d 1129 (quoting *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996)).

## B.

### *Prior Questioning in Violation of Miranda*

■ Relying on *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) and *Cooper v. State,* 163 Md.App. 70, 877 A.2d 1095 (2005), appellant argues that Detective Sofelkanik committed "a patent violation" of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by asking appellant if appellant would agree to speak to him and answer questions prior to administering the *Miranda* warnings. Appellant contends that Detective Sofelkanik "effectively obtained from [a]ppellant his commitment to speak about the crime prior to advising [a]ppellant of his [*Miranda* rights]." This commitment to speak, appellant argues, "created the impression that the interrogation was underway and that the advice of rights to follow was a mere formality." Because a reasonable person in appellant's circumstances would have understood that the agreement to cooperate could not be revoked, appellant argues that his "subsequent waiver of *Miranda* rights cannot be considered voluntary and the statement that followed should not have been admitted against him at trial."

In response, the State asserts that *Seibert* and *Cooper* are inapplicable because Detective Sofelkanik "never asked any questions or elicited any incriminating statements from [appellant] prior to advising him of his rights."

In denying the motion to suppress, the court ruled:

I've looked at the *Seibert* case. And it deals with, as you were saying, it deals with a situation where the police basically had a practice, they had a protocol where they would specifically not advise people prior to getting a confession. And then having gotten a confession, they would go ahead and do the advice of rights and then re-get the confession.

And so it really, as they say, it deals with the midstream recitation of warnings, after interrogation, unwarned confessions have occurred.

In our case the statement was made that [Detective Sofelkanik] was going to be asking [appellant] questions, and asked [appellant] if he would speak. But there was no confession. There was no interrogation. There was no followup to that.

And I don't find that it was, as in the *Missouri v. Seibert* case, it was a willful protocol that the police used for the purpose of getting a confession. I don't find that anything the detective did was a willful violation of Miranda.

In *Miranda*, the Supreme Court held that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. 1602. Custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* When a suspect is in custody, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A person may waive the effectuation of his or her *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

It is well established that *Miranda* warnings are not required in the absence of interrogation. *Ashford v. State*, 147 Md.App. 1, 37, 807 A.2d 732 (2002) (citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)); *see Marr v. State*, 134 Md.App. 152, 173, 759 A.2d 327 (2000) (" '[I]t is clear ... that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.' " (alteration in original) (quoting *Innis*, 446 U.S. at 300, 100 S.Ct. 1682)). "Interrogation" under *Miranda* "refers ... to any words or actions on

the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. An incriminating response is one "whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. 1682.

The motions court in the instant case determined that there was "no interrogation" within the meaning of *Miranda.*[9] We agree. Detective Sofelkanik asked appellant only whether appellant "wanted to talk to me." This question was not "reasonably likely to elicit an incriminating response," nor did it do so. *See Innis*, 446 U.S. at 301, 100 S.Ct. 1682. Appellant simply answered "yes", at which point Detective Sofelkanik advised appellant that he could not ask appellant any questions until he advised appellant of his constitutional rights. It was only after Detective Sofelkanik (1) read appellant his *Miranda* rights using the MCP–50 form, (2) obtained appellant's acknowledgment that he understood those rights, and (3) learned that appellant was willing to talk, that Detective Sofelkanik questioned appellant about the incident. Moreover, Detective Sofelkanik testified that the purpose of his initial question was "kind of an ice breaker." He said: "Just to let [appellant] know that I was not the arresting officer. That he was there, that I would like to speak to him and he felt comfortable." Finally, we observe that Detective Sofelkanik's question also had a practical purpose—if appellant had indicated no desire to talk, there would have been no realistic reason for Detective Sofelkanik to proceed with reading appellant his *Miranda* rights in an effort to secure a statement. It would have been highly unlikely that, after

---

9. Because the court also said that there was no "willful" *Miranda* violation, appellant argues that such wording "necessarily presupposes a *Miranda* violation." Appellant thus claims error because whether or not a violation was willful is irrelevant as a matter of law. We agree with the State that appellant "relies on a strained interpretation of a portion of the trial court's ruling." At no point in its ruling did the court find, or presuppose, that there was a *Miranda* violation.

refusing to talk, appellant would have changed his mind upon being advised of his *Miranda* rights.

Even assuming that *Miranda* applies to the case *sub judice*, we conclude that there was no violation of its procedural safeguards. Appellant's reliance on *Seibert* and *Cooper* in this regard is misplaced.

In *Seibert*, the Supreme Court struck down a two-step, "question-first" interrogation technique employed by police in that case. 542 U.S. at 604, 612, 124 S.Ct. 2601. The police protocol at issue in *Seibert* called for the purposeful withholding of *Miranda* warnings until police interrogation produced a confession. *Id.* Following the confession, the police officer would administer the *Miranda* warnings and then question the suspect again to elicit the same confession. *Id.* Although the first confession, obtained pre-*Miranda* warnings, was inadmissible, the second confession was ostensibly admissible in court. *Id.* The Court in *Seibert* held that, when such a strategy is used, the second confession must be suppressed "because the midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement." *Id.*

Similarly, in *Cooper*, the police conducted a two-stage interrogation technique when questioning the appellant. 163 Md. App. at 74, 877 A.2d 1095. The police obtained two statements during interrogation, the first unwarned and the second warned. *Id.* At trial, over the appellant's objection, the State introduced only the second, warned statement into evidence. *Id.* Relying on *Seibert*, this Court reversed the appellant's murder and associated weapons convictions. *Id.* at 74, 96, 877 A.2d 1095.

The case *sub judice* does not present the interrogation technique condemned by *Seibert* and *Cooper*, because Detective Sofelkanik did not use the "successive interrogation" strategy employed by the police in those cases. *See Seibert*, 542 U.S. at 613, 124 S.Ct. 2601; *Cooper*, 163 Md.App. at 96, 877 A.2d 1095. Detective Sofelkanik never obtained an incriminating statement from appellant before he administered

the *Miranda* warnings, nor did he elicit that same incriminating statement again "on the heels of the unwarned statement." *See Cooper*, 163 Md.App. at 96, 877 A.2d 1095. Nevertheless, appellant argues that Detective Sofelkanik's question had the effect of "obtain[ing] from [a]ppellant his commitment to speak about the crime prior to advising [a]ppellant of his [*Miranda* rights]." The short answer to this contention is that there is no evidence in the record supporting the existence of such commitment. Appellant never testified that his affirmative response to Detective Sofelkanik's question somehow obligated him to talk to the police after being advised of his *Miranda* rights.[10] Therefore, asking appellant "if he wanted to talk to" Detective Sofelkanik prior to advising appellant of his *Miranda* rights was not a violation of *Miranda* under the teachings of *Seibert* and *Cooper*.

## *C.*

### *Request for Mother, An Attorney*

At the suppression hearing, appellant testified that, while being fingerprinted,[11] he made a request to an unnamed officer to "[j]ust to call [his] mother" and told the officer that his mother was an attorney. Appellant also testified that, prior to being placed in a holding cell, he asked to call his mother "[s]everal times." Finally, appellant testified that, while inside the holding cell, he asked another officer if he could call his mother, saying, "mother's a lawyer," and that the officer responded that he could not "do anything." Appellant, howev-

---

10. Even if appellant had so testified, his commitment to talk to the police would not have been an incriminating response within the meaning of *Miranda*, nor would it necessarily render the subsequent *Miranda* warnings ineffective.

11. At trial, Detective Sofelkanik testified that, although he did not have specific knowledge of when appellant was fingerprinted, it is police procedure to take fingerprints after interrogation. The State argues in its brief that this testimony "suggests that [appellant] asked to call his mother after his statement was already made." For the purpose of our analysis, we need not resolve this issue and shall accept appellant's version.

er, could not remember if he requested to speak to his mother, an attorney, when advised by Detective Sofelkanik of his right to an attorney before and during any questioning.

Appellant argues that his statement to Detective Sofelkanik should have been suppressed because the trial judge's finding that appellant did not invoke his right to counsel was clearly erroneous. Appellant maintains that he "plainly testified that he asked to call his mother—an attorney—several times prior to being placed in the interrogation room." [12]

In denying the suppression motion, the court made the following factual findings:

All right. Well based upon the testimony that I've heard regarding the Advice of Rights form, in looking at Exhibit No. 1, the detective testified about the procedure that he used and the procedure he followed in advising the rights, pursuant to this form MCP–50 ....—it appears as though the detective followed the proper procedure in advising [appellant] of his rights.

... There has been, according to the detective, there was never an invocation of Right to Counsel; there was never any request to stop speaking. He described the conversation as very normal. He asked questions, [appellant] responded and I think he used the word that he was "dictating" and so he wrote down the statements as best he could that [appellant] made to him.

After that he gave the statement to [appellant] for review. [Appellant] looked at it, actually made changes, initialed the changes, indicating to me that he understood the statement enough that he wanted the corrections and changes made to the statement.

... [Appellant] at one point on the stand said, and **I don't believe he said clearly and specifically that he asked for a lawyer in this case. He said that his mom was a**

---

12. Appellant also claims that he asked to call his mother, an attorney, "at least one time" after his interrogation. We need not address appellant's alleged invocation of his right to counsel after interrogation because he made no confession thereafter.

lawyer. **He said that he asked to speak to his mom. He's not sure, he thinks he said that. He's not sure who he said it to, when he said it, where he was when he said it. So I'm not certain that he's even certain that he said it.** So based upon that I can't find, to the degree necessary, that he invoked counsel. Given the fact that I'm not even certain that he's certain he said it. So for that reason I'm going to find that *Miranda* was complied with and I'll find that the statement was voluntarily made by [appellant]. (Emphasis added).

■ We give great deference to a hearing judge's factual findings, and we will not disturb them unless they are clearly erroneous. *State v. Nieves*, 383 Md. 573, 581, 861 A.2d 62 (2004); *see also Matthews v. State*, 106 Md.App. 725, 732, 666 A.2d 912 (1995) ("In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to weighing and determining first-level facts."). Applying that standard to the record before us in the instant case, we conclude that there was sufficient support in the record for the motions court's factual finding.

■ The motions court determined that appellant was so uncertain as to whether he asked for an attorney that his claims were insufficient for a finding that there was a clear and specific request for counsel. Appellant could not recall to whom he made any of the requests to call his mother or whether all of his requests were made to the same officer. Appellant also could not recall if he asked Detective Sofelkanik if he could speak to his mother. Detective Sofelkanik testified that appellant never requested an attorney when he read appellant his Advice of Rights. Both appellant's general uncertainty and the unequivocal testimony of Detective Sofelkanik cast doubt on whether appellant ever invoked his right to counsel. Moreover, "[i]t is the trial judge who determines the credibility of witnesses when, as in a suppression hearing, he functions as the trier of fact." *Carter v. State*, 80 Md.App. 686, 690, 566 A.2d 131 (1989). The trial judge determined that

appellant was not a credible witness, stating "I don't believe [appellant] said clearly and specifically that he asked for a lawyer." The trial judge explained: "He's not sure who he said it to, when he said it, where he was when he said it. So I'm not certain that he's even certain that he said it." Therefore, there is "competent evidence to support the trial court's factual finding[ ]" that appellant never invoked his right to counsel. *See Fuge v. Fuge*, 146 Md.App. 142, 180, 806 A.2d 716 (2002) ("If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous.").

Nevertheless, appellant asserts that the trial court was clearly erroneous because appellant's *"only* uncertainty" in invoking his right to counsel "pertained to whether he had asked *Detective Sofelkanik* if he could place a telephone call to his mother." Appellant contends that, although he "did not remember the names of the individual officers to whom he made the requests, [ ] he never wavered in his account that the requests were repeatedly made." In so arguing, appellant refers us to appellant's testimony that he asked to speak to his mother, an attorney, several times before he was placed in the holding cell and once while he was in the holding cell, all of which occurred prior to being placed in the interrogation room and questioned by Detective Sofelkanik. Even assuming that the trial court's factual finding was clearly erroneous, appellant still cannot prevail under the law.

In *McNeil v. Wisconsin*, 501 U.S. 171, 182, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court held that an accused's invocation of his Sixth Amendment right to counsel at a bail review hearing did not constitute the invocation of the accused's *Miranda* right to counsel under the Fifth Amendment. Writing for the Court, Justice Scalia discussed, among other things, "this Court's jurisprudence relating to the Fifth Amendment guarantee that '[n]o person ... shall be compelled in any criminal case to be a witness against himself.' " *Id.* at 176, 111 S.Ct. 2204. He said:

In *Miranda v. Arizona*, 384 U.S. 436[, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), we established a number of prophylac-

tic rights designed to counteract the "inherently compelling pressures" of custodial interrogation, including the right to have counsel present. *Miranda* did not hold, however, that those rights could not be waived. On the contrary, the opinion recognized that statements elicited during custodial interrogation would be admissible if the prosecution could establish that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.,* at 475[, 86 S.Ct. 1602.]

In *Edwards v. Arizona,* 451 U.S. 477[, 101 S.Ct. 1880, 68 L.Ed.2d 378] (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U.S., at 484–485[, 101 S.Ct. 1880]–which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi,* 498 U.S. 146[, 111 S.Ct. 486, 112 L.Ed.2d 489] (1990).

*Id.* at 176–77, 111 S.Ct. 2204.

Justice Scalia then articulated the requirements for invoking one's Fifth Amendment right to counsel:

The rule of that case [*Edwards* ] applies only when the suspect "ha[s] *expressed* " his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.* It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.* Requesting the assistance of an attorney at a bail hearing does not bear that construction. "[T]o find that [the defendant] invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request."

*Id.* at 178–79, 111 S.Ct. 2204 (citations omitted) (alteration in original) (emphasis in original).

In a footnote, Justice Scalia elaborated further on the invocation of the *Miranda* right to counsel:

> **We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation"**—which a preliminary hearing will not always, or even usually, involve[.] If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. **The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.**

*Id.* at 182 n. 3, 111 S.Ct. 2204 (citations omitted) (emphasis added).

In *Marr v. State*, 134 Md.App. 152 [759 A.2d 327] (2000), *cert. denied,* 362 Md. 623 [766 A.2d 147] (2001), this Court had the occasion to apply the principles enunciated in *McNeil* to the appellant's alleged invocation of his Fifth Amendment right to counsel when, prior to the appellant's arrest, the appellant's attorney advised police that the appellant "would make no statement to police officers without his attorney being present." *Marr,* 134 Md.App. at 159 [759 A.2d 327]. We held that the "appellant did not validly invoke his Fifth Amendment right to counsel because the invocation by counsel occurred outside of the context of custodial interrogation." *Id.* at 173 [759 A.2d 327]. Speaking for this Court, Judge James Eyler explained:

> *Miranda's* safeguards were intended to provide protection against the inherent coerciveness of custodial interrogation. **The "inherent compulsion" that is brought about by the**

combination of custody and interrogation is crucial for the attachment of *Miranda* rights. *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602 [16 L.Ed.2d 694]. As the Supreme Court articulated in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), "[i]t is clear . . . that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."

*Id.* (emphasis added).

Judge Eyler also observed that "at least five federal courts of appeal subsequently have interpreted [*McNeil*] to mean that an individual may not invoke the *Miranda* right to counsel before custodial interrogation has begun or is imminent." *Id.* at 175, 759 A.2d 327.[13] Nevertheless, because in *Marr* the purported invocation of the right to counsel occurred before the appellant was in custody, Judge Eyler concluded that "we need not decide whether, in addition to custody, interrogation must be actual or at least imminent before the right to counsel can be invoked." *Id.* at 178, 759 A.2d 327.

In *Costley v. State,* 175 Md.App. 90, 111, 926 A.2d 769 (2007), this Court had the opportunity to revisit the issue left open in *Marr.* In *Costley,* after his arrest, Costley told the officer who escorted him to a holding cell that he wanted an attorney. *Costley,* 175 Md.App. at 99, 926 A.2d 769.[14] We

---

**13.** The five federal courts were the Second, Third, Seventh, Ninth, and Eleventh Circuit Courts of Appeal. *See United States v. Grimes,* 142 F.3d 1342, 1347–48 (11th Cir.1998), *cert. denied,* 525 U.S. 1088, 119 S.Ct. 840, 142 L.Ed.2d 695 (1999); *United States v. Thompson,* 35 F.3d 100 (2d Cir.1994); *Alston v. Redman,* 34 F.3d 1237 (3d Cir.1994), *cert. denied,* 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995); *United States v. LaGrone,* 43 F.3d 332 (7th Cir.1994); *United States v. Wright,* 962 F.2d 953 (9th Cir.1992).

**14.** Costley also testified that he asked the arresting officer for an attorney while he was being transported to the police station. *Costley,* 175 Md.App. at 99, 926 A.2d 769. The arresting officer denied that such request had been made, and the motions court believed the officer's testimony. *Id.* at 98–100, 926 A.2d 769. Accordingly, this

held that Costley did not validly invoke his Fifth Amendment right to counsel. *Id.* at 110, 926 A.2d 769. We explained that the Supreme Court's language in *McNeil* "suggests that custody, absent interrogation, is insufficient." *Id.* at 111, 926 A.2d 769. We stated that "in order for the *Miranda* safeguards to take effect, there must first exist custodial interrogation" *Id.* at 112, 926 A.2d 769 (internal quotations omitted). On that basis, we concluded that any request made by Costley to the officer who placed him in a holding cell was ineffective. *Id.* at 112, 926 A.2d 769.

 We come to the same conclusion in the case *sub judice* as we did in *Costley.* Assuming that appellant clearly expressed his desire for the assistance of counsel by repeatedly asking to talk to his mother, an attorney, all such requests were made by appellant prior to being placed in the interrogation room and questioned by Detective Sofelkanik. As found by the trial court, and not disputed by appellant, at no time from his entry into the interrogation room until the completion of his statement did appellant ask to speak with his mother, or otherwise request the assistance of counsel. Accordingly, we hold that appellant did not validly invoke his Fifth Amendment right to counsel prior to giving a statement to Detective Sofelkanik.

## II.

### Flight Instruction

Appellant argues that the trial court erred in instructing the jury as to flight because the evidence failed to generate such an instruction. Appellant asserts that "[t]he simple fact that [a]ppellant left the scene at some point was not tantamount to evidence of flight so as to generate a flight instruction." According to appellant, "[a]bsent any evidence that [a]ppellant knew the police were looking for him or that he was actually being pursued by the police, there simply is no inference of

Court upheld the motions court on the basis of the motions court's finding on credibility. *Id.* at 112, 926 A.2d 769.

guilt to be drawn from the mere fact that he departed the area." Appellant concludes that the instant case fails to satisfy even one of the four inferences, set forth in *Thompson v. State*, 393 Md. 291, 312, 901 A.2d 208 (2006), that must be drawn from the facts in order for a flight instruction to be proper. Because the flight instruction was "wholly unwarranted" and "extremely prejudicial," appellant maintains that reversal is required.

The State responds that the trial court properly exercised its discretion to instruct the jury using the pattern jury instruction on flight. Also relying on *Thompson*, the State argues that the pattern flight instruction is a correct statement of law, that the content of the instruction was not fairly covered by other instructions, and that the requested instruction is applicable under the facts of this case. According to the State, the flight instruction is applicable because the record contains more than "some evidence" that appellant "fled the scene of the crime with the other perpetrators."

At trial, the prosecutor requested that the court give a flight instruction because (1) appellant left the scene only seconds behind the others, and (2) the instruction gives the jury discretion to determine whether there was flight. Defense counsel objected to the State's request, arguing that appellant "stayed behind" and "didn't flee with the other codefendants." The trial court overruled appellant's objection, stating:

Okay. In looking at the instruction, it indicates that the jury has to decide whether or not there was in fact flight. And then if there was flight, then they have to determine whether or not that amounts to evidence of a consciousness of guilt.

And in this particular case, there is evidence that he left with the group; there's evidence that he stayed behind. And there's even evidence that he stayed behind and talked to one or two of the witnesses about the bike, and there's evidence that he went and talked to the group about getting the bike back. Those are all things that the jury has to consider and it's their determination to decide what in fact

happened. And the range runs from the very first statement to the very last statement that I've made.

So, given the way that this flight instruction is presented, that they have to determine if flight did occur. And that's an essential, not essential, but it's an important factor in this case. I'll read 3.24.

The court then instructed the jury, using Maryland Pattern Jury Instructions–Criminal 3:24:

A person's flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight. If you decide there is evidence of flight, then you must decide whether this flight shows consciousness of guilt.

Defense counsel noted an exception to the giving of the flight instruction.

In *Thompson,* the Court of Appeals set forth a thorough discussion and analysis of the flight instruction under Maryland law. The appellant in *Thompson* initially urged the Court to overrule precedential case law approving the flight instruction and to declare such instruction *per se* improper. *Thompson,* 393 Md. at 302, 901 A.2d 208. The Court declined to do so, stating that "[w]e have consistently upheld the propriety of flight instructions." *Id.* at 304, 901 A.2d 208. "Our position has been consistent with the majority of both federal and State jurisdictions, which allow flight instructions in appropriate circumstances where the evidence supports an inference of consciousness of guilt." *Id.* at 304 n. 2, 901 A.2d 208.

The Court of Appeals then proceeded to analyze the trial court's giving of the flight instruction in *Thompson* under

Maryland Rule 4–325(c),[15] which governs the giving of instructions to the jury. The Court said:

> We have interpreted Rule 4–325(c) as
>
> requir[ing] the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given.

*Id.* at 302, 901 A.2d 208 (alteration in original).

The Court determined that the flight instruction given by the trial court in *Thompson,* which was identical to Maryland Pattern Jury Instructions–Criminal 3:24, "accurately reflects the law of the State of Maryland." *Id.* at 303, 901 A.2d 208. The Court also concluded that the substance of the flight instruction was not adequately covered by "the general jury instructions regarding inferences from the evidence generally [Maryland Pattern Jury Instructions–Criminal 3:00], and the appropriate weight to be given to circumstantial evidence in particular [Maryland Pattern Jury Instructions–Criminal 3:01]." *Id.* at 308, 901 A.2d 208.

Finally, the *Thompson* Court focused on whether the flight instruction was applicable under the facts before it. *Id.* at 310–11, 901 A.2d 208. The Court reiterated its adoption of the four-prong test set forth in *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977), regarding the propriety of giving a flight instruction. *Thompson,* 393 Md. at 311, 901 A.2d 208. The Court held that,

> for an instruction on flight to be given properly, the following four inferences must reasonably be able to be drawn

---

**15.** Rule 4–325(c) reads as follows:

> (c) How Given. The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

from the facts of the case as ultimately tried: that the behavior of the defendant suggests flight; that the flight suggests a consciousness of guilt; that the consciousness of guilt is related to the crime charged or a closely related crime; and that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime.

*Id.* at 312, 901 A.2d 208.

The issue in *Thompson,* according to the Court, was the third inference, namely, "that the consciousness of guilt was consciousness of guilt of the crimes for which [the appellant] was on trial." *Id.* Under the circumstances present in *Thompson,* the Court concluded that it was both error and abuse of discretion for the trial judge to give the flight instruction.[16] *Id.* at 311, 315, 901 A.2d 208.

---

**16.** In *Thompson,* the appellant was on trial for charges arising out of a shooting that occurred on the 1300 block of East Pratt Street in Baltimore City. *Thompson,* 393 Md. at 294, 901 A.2d 208. At least five shots were fired at three individuals who were walking to their hotel near the Inner Harbor after dinner. *Id.* One of the victims was hit in the arm and taken to the hospital. *Id.* At the hospital, the police obtained a description of one of the perpetrators and broadcast the same. *Id.*

When a police detective arrived at the location of the shooting, he saw the appellant, who was on a bicycle. *Id.* The appellant matched the broadcast description. *Id.* The detective then ran toward the appellant, identified himself as a police officer, and yelled for him to stop. *Id.* The appellant saw the detective, but pedaled faster away from him. *Id.* When the appellant was caught five minutes later by other police officers, he had eighty-six vials of crack cocaine on him. *Id.* at 313, 901 A.2d 208. The trial court later suppressed all evidence relating to the cocaine and dismissed the charges arising out of the possession of controlled dangerous substances. *Id.* at 295, 901 A.2d 208.

The Court of Appeals stated that "[t]he gravamen of the issue is whether [the appellant] fled in an attempt to avoid apprehension for the crimes for which he was on trial." *Id.* at 313, 901 A.2d 208. The appellant told the police that he ran from them because he had illegal drugs on him. *Id.* Because the evidence of cocaine had been suppressed, the jury was not presented with this alternative motive for the appellant's flight. *Id.* The Court found that "this fact ... undermines the confidence by which the inference could be drawn that [the appellant's] flight was motivated by a consciousness of guilt with respect to the crimes for which he was on trial." *Id.* at 314, 901 A.2d 208.

■ Like the Court of Appeals in *Thompson*, this Court concludes in the case *sub judice* that the Maryland pattern jury instruction on flight, given by the trial judge, is a correct statement of Maryland law and that such instruction was not fairly covered by the other instructions given to the jury. Unlike *Thompson*, however, whether the flight instruction is applicable under the facts of the instant case involves the first two inferences of the *Myers* test, namely, whether "the behavior of [appellant] suggests flight" and whether "the flight suggests a consciousness of guilt." *Thompson*, 393 Md. at 312, 901 A.2d 208. Appellant argues that the "fact that [a]ppellant left the scene at some point was not tantamount to evidence of flight so as to generate a flight instruction," because "there simply is no inference of guilt to be drawn from the mere fact that [appellant] departed the area." We agree.

■ Flight is defined as an "act or instance of fleeing, esp. to evade arrest or prosecution.... Also termed *flight from prosecution; flee from justice*." BLACK'S LAW DICTIONARY 670 (8th ed.2004). Professor Wigmore employs the term "flight from justice":

> Flight from justice and its analogous conduct, have always been deemed indicative of a consciousness of guilt. "The wicked flee, even when no man pursueth; but the righteous are bold as a lion."...
>
> It is universally conceded today that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself[.]

2 Wigmore, EVIDENCE § 276 (Supp.2007) (footnote omitted).

■ "At its most basic, evidence of flight is defined by two factors: first, that the defendant has moved from one location to another; second, some additional proof to suggest that this movement is not simply normal human locomotion." 22 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 5181 (1978 & Supp.2007). This additional proof

of other than normal human movement also must reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt. *State v. Lincoln,* 183 Neb. 770, 164 N.W.2d 470, 472 (1969).[17] In the context of leaving the scene of a crime, the classic case of flight is where a defendant leaves the scene shortly after the crime is committed and is running, rather than walking, or is driving a speeding motor vehicle. On the other hand, merely walking away from the scene of a crime ordinarily does not constitute flight.

In *Lincoln,* a window at a jewelry store was broken at night and various items taken from the window display. *Lincoln,* 164 N.W.2d at 471. Within seconds a service man from the alarm company saw a car, with the defendant and a companion inside, come around the corner one block from the scene of the crime traveling 30 miles per hour without its headlights on. *Id.* Five minutes before the burglary, a police officer observed the same car with its lights off in an alley 2½ blocks from the jewelry store. *Id.* at 472. When the officer started to drive his cruiser down the alley, the defendant's car pulled out at the other end of the alley. *Id.*

The Supreme Court of Nebraska decided that a flight instruction was proper where the defendant's conduct was "clearly sufficient to sustain an inference of flight as distinguished from mere departure from the scene of a crime." *Id.* The Court drew a distinction between the meaning of the words "flight" and "departure:"

The term "flight" is often misused for the word "departure." **Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt.** "Flight" may be established by a broad range of circumstances. **We believe the proper rule to be that for departure to take on the legal significance of flight, there must be circumstances present and unexplained which,**

---

**17.** *Lincoln* was cited with approval by the Court of Appeals in *Thompson. See Thompson,* 393 Md. at 304 n. 2, 901 A.2d 208.

> in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.

*Id.* (emphasis added).

Courts in other states have drawn a similar distinction between "flight" and "departure." *See e.g., State v. Rodgers,* 103 Ariz. 393, 442 P.2d 840, 842 (1968) ("Clearly before an instruction on flight can be given the evidence must disclose more than a mere departure from the scene."); *People v. Clem,* 104 Cal.App.3d 337, 163 Cal.Rptr. 553, 557 (1980) (stating that the mere fact that the defendant did not remain at the scene of the crime, but was arrested several days later at a different locale, was insufficient to warrant a flight instruction); *People v. Zertuche,* 5 Ill.App.3d 303, 282 N.E.2d 201, 204 (1972) ("The concept of flight embodies more than just leaving the scene of the crime. The defendant must be attempting to avoid arrest or detention."); *State v. Bruton,* 66 Wash.2d 111, 401 P.2d 340, 341–42 (1965) ("[T]he evidence or circumstances introduced and giving rise to the contention of flight must be substantial and sufficient to create a reasonable and substantive inference that the defendant's departure from the scene of difficulty was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution."); *State v. Sullivan,* 43 N.J. 209, 203 A.2d 177, 192 (1964) ("For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.").

Therefore, we hold that an accused's departure from the scene of a crime, without any attendant circumstances that reasonably justify an inference that the leaving was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt, does not

constitute "flight," and thus does not warrant the giving of a flight instruction.

We acknowledge the State's argument that the pattern flight instruction does not presume that flight occurred. The language of the instruction leaves it to the jury to first decide whether there is evidence of flight. Only then is the jury instructed to decide whether the evidence of flight shows a consciousness of guilt. Regardless, we conclude that when a flight instruction is not generated by the facts of the case, the instruction should not be given. Otherwise a flight instruction would be warranted in virtually every case.

In the instant case, taking the evidence in a light most favorable to the State, appellant simply walked away from the scene of the crime with the group of individuals who had just perpetrated the robberies. When appellant left the scene, the police had not arrived, nor was their arrival imminent. There was no evidence that appellant attempted to flee the neighborhood or to secrete himself from public view to avoid apprehension. Indeed, only 10–15 minutes after the crime, the police stopped appellant in a nearby neighborhood with three of the other perpetrators, one of whom possessed some of the stolen property. Under the facts of this case, we conclude that there were no circumstances attendant to appellant's departure from the scene of the crime that would reasonably justify the inference of a consciousness of guilt. Accordingly, appellant's behavior did not constitute flight, and the trial court erred in giving the flight instruction.[18]

---

18. The State also argues that the flight instruction was proper because appellant placed his mental status at issue, *i.e.*, appellant "did not have the requisite intent to aid and abet the commission of the robberies." The Court in *Thompson* noted that a flight instruction is "particularly appropriate in circumstances where a defendant places his or her mental status at the time that the crime was committed in issue." *Thompson*, 393 Md. at 308, 901 A.2d 208. The Court's statement, however, was made in the context of its discussion of whether the giving of the flight instruction is improper *per se*, not whether the flight instruction is applicable under the circumstances of a particular case. In other words, the Court did not say that the placement of one's mental status at issue can serve as a substitute for the presence of the

 Finding error, we must next decide whether the error in the instant case was harmless. Error is harmless when "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *State v. Logan*, 394 Md. 378, 388, 906 A.2d 374 (2006) (internal quotation omitted); *see Ragland v. State*, 385 Md. 706, 726, 870 A.2d 609 (2005). Where "error cannot be deemed 'harmless[,]'[ ] a reversal is mandated." *Bryant v. State*, 129 Md. App. 150, 162, 741 A.2d 495 (1999).

The evidence adduced at trial in support of appellant's guilt was far from overwhelming. One victim testified that, during the altercation, appellant "stood somewhat to the side." Another victim, when asked, "What did you see [appellant] do?," testified, "I don't believe he was doing anything." When interviewed by an investigator, a third victim admitted that appellant was "the older guy who was standing there" and was not "in the group" but was "off to the side." One victim also testified that he did not see appellant strike anyone directly. There was no evidence that appellant took any victim's property or was seen carrying such property away from the scene. When appellant was stopped by the police, none of the stolen property was in his possession.

The State's theory for appellant's culpability was as an aider and abettor. But that theory also had its evidentiary problems. Gary Schneider testified that, after the fight ended, appellant stayed behind while the others in the group left with the victims' bicycles and other property. According to Phillips' testimony, when Gary Schneider asked appellant if he could get the bicycles back, appellant replied, "I don't know what I can do about it, but I'll see." Appellant then caught up with the group of perpetrators and was seen talking to them. Upon our own review of the entire record, we cannot assert a belief beyond a reasonable doubt that the flight instruction had no influence on the verdicts against appellant. Therefore,

---

four inferences required by the *Myers* test. Here, the first two of those inferences are not present.

**328**

the giving of the flight instruction constituted an abuse of discretion.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. CASE REMANDED FOR A NEW TRIAL. MONTGOMERY COUNTY TO PAY COSTS.**