Filed 3/17/14  P. v. Belmontez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057152 |
| v. | (Super.Ct.No. FVA1101852) |
| ISAAC RAY BELMONTEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Charles E. Mullis for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Stephanie H. Chow and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Isaac Ray Belmontez, guilty of (1) attempted murder (Pen. Code, §§ 664, 187, subd. (a)),[1] and (2) two counts of assault with a firearm (§ 245, subd. (a)(2)). As to the attempted murder, the jury found true the following allegations (1) the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)), (2) defendant inflicted great bodily injury (§ 12022.7, subd. (a)), (3) defendant used a firearm (§ 12022.53, subd. (b)), (4) defendant discharged a firearm (§ 12022.53, subd. (c)), and (5) defendant discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). As to both assault convictions, the jury found true the allegations (1) defendant committed the crimes to benefit a criminal street gang (§ 186.22, subd. (b)(1)(B)), and (2) defendant used a firearm (§ 12022.5, subds. (a) & (d)). In the Count 4 assault conviction, the jury also found true the allegation defendant inflicted great bodily injury. (§ 12022.7, subd. (a).)

The trial court sentenced defendant to prison for a determinate term of seven years, four months, and an indeterminate term of 40 years to life.[2] Defendant contends his convictions should be reversed because the prosecutor committed misconduct by improperly cross-examining the only defense witness. We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The trial court incorrectly pronounced defendant's total determinate sentence as 10 years, 4 months. The determinate abstract judgment reflects defendant's determinate sentence is seven years, four months. The parties agree defendant's determinate sentence is seven years, four months.

2

## FACTUAL AND PROCEDURAL HISTORY

A.      PROSECUTION'S CASE

On December 2, 2011, at approximately 8:00 p.m., Jesus N. (N.), Jorge A. (A.), and Victor Miramontes were in Fontana walking to a bus stop. All three were members of, or affiliated with, the Latin Kings gang. While they were walking, N. and A. were shot. It appeared N. was shot in the knee, while A. was shot in the stomach and back of his head.

N. was 17 years old at the time of the shooting, and A. was 15 years old. A police officer asked N. to identify the shooter, but N. "kept saying, 'I don't know.'" It appeared N. did not want to speak to the officer. The area where the shooting occurred was part of a territorial dispute between the Latin Kings gang and the South Fontana gang.

A.'s sister, Lydia S. (S.) visited A. in the hospital. Three or four days after the shooting, A. was able to talk, and S. asked who shot him. A. said the shooter had "spiky hair, darkish, he was tall," he drove a black Saturn, lived on Blanchard Street, and used the moniker "Vibe." S. asked N. who shot him, and N. said "Vibe." S. told police officers about the information identifying the shooter.

A. told a police officer that, prior to being shot, he heard a gun rack or cock, and he turned around. A. saw the shooter. A. said the shooter's name was Isaac, he drove a black Saturn, and he lived "just around the corner from where the shooting took place." A. also told the officer he believed the shooter was a member of the South Fontana gang.

Defendant lived approximately 100 yards from the location where the shooting occurred. During the booking process, defendant told Fontana Police Officer Miller that his nickname was Vibe. During an interview, Officer Miller asked defendant where he was at the time of the shooting. Defendant initially said he was at football practice. Defendant then gave Officer Miller additional places where he may have been during the shooting: (1) driving home from football practice; (2) at home; and (3) at home, but barbecuing with his girlfriend, their baby, and a friend.

At trial, N. said he did not see the shooter because "[i]t was kind of dark" and N. "was like drunk and stuff." At trial, A. said he did not remember being shot or a person shooting at him. A. testified he was under the influence of morphine when he described the shooter to police, if he did provide a description. A. said he was also under the influence of medication at the preliminary hearing. A. denied knowing defendant.

B.     DEFENSE'S CASE

The defense presented a single witness at trial: defendant's girlfriend of five years, Margaret Aguirre (Aguirre). Aguirre said she was at the home where defendant lived with his parents on December 2, 2011, at 8:00 p.m. Defendant and Aguirre were watching television. Aguirre said defendant did not leave the house that night.

4

C.     CROSS-EXAMINATION

During the prosecutor's cross-examination of Aguirre, the prosecutor asked, "Prior to your testimony here today, have you talked to [defendant] about where he was on December 2nd, 2011?" Aguirre responded, "No." Shortly thereafter, the following exchange took place:

"[Prosecutor:] Now, when you spoke to [defendant], was one of the possible locations of where he was on December 2nd, 2011, did he tell you he might be coaching a flag football team?

"[Aguirre:] Yes.

"[Prosecutor:] And he told you that there was also the possibility that he might have been home; correct?

"[Aguirre:] Yes.

"[Prosecutor:] And he gave you different possibilities of where he might have been that day; correct?

"[Aguirre:] No.

"[Defense Counsel:] Objection. Relevance. Calls for hearsay.

"The Court: Overruled."

"[Prosecutor:] Did defendant tell you that he remembers being with his friend Jonathan Mora on December 2nd, 2011?

"[Aguirre:] Yes.

5

"[Prosecutor:] So first he remembers being home; correct? That was one of the things you testified, that [defendant] told you I might have been home as a possibility; right? [¶] . . . [¶]

"[Aguirre:] Yes.

"[Prosecutor:] Okay. And then he also said a second possibility, I might have been at a football game on December 2nd, 2011; right?

"[Defense Counsel:] Objection. Vague as to time on December 2nd.

"The Court: Sustained.

"[Prosecutor:] That evening at 8:00 o'clock, [defendant] gave you different possibilities of where he might have been; correct?

"[Defense Counsel:] Objection. Again, vague as to time and 'where he might have been.'

"The Court: Overruled. [¶] You may answer, if you know, ma'am. Do you understand the question, or do you need her to repeat it for you?

"[Aguirre:] She's confusing me.

"The Court: Okay. Could you repeat the question, [prosecutor]?

"[Prosecutor:] Yes, I will. [¶] On—when you spoke to [defendant]—

"[Aguirre:] Uh-huh.

"[Prosecutor:] —one of the things he said to you was, I might have been home on December 2nd, 2011, about 8:00 o'clock that evening; right?

"[Aguirre:] He was home.

"[Prosecutor:] Okay. I'm asking you about his words to you.

6

"[Aguirre:]  Okay.

"[Prosecutor:]  One of the things he told you—[defendant] to you—is I might have been home at about 8:00 o'clock on December 2nd?

"[Aguirre:]  Yes.

"[Prosecutor:]  Okay.  Another thing that he told you is, well, I might have been at a football game on December 2nd, 2011, about 8:00 o'clock.  That was another possibility; right?

"[Aguirre:]  No.  That was earlier.  The football was before he came home—

"[Prosecutor:]  Motion to strike as nonresponsive.  It's calling for a yes or no answer.

"[Aguirre:]  Yes.

"The Court:  Everything after 'No.  That was earlier' will be stricken.

"[Prosecutor:]  Thank you.  [¶]  Now, another possibility [defendant] gave you, at about 8:00 o'clock on December 2nd, 2011, is he was possibly with his friend Jonathan Mora; correct?

"[Aguirre:]  Yes.

"[Prosecutor:]  Was Jonathan Mora at your house on December 2nd, 2011, at about 8:00 o'clock?

"[Aguirre:]  No.

"[Prosecutor:]  However, [defendant] did tell you that he remembered on December 2nd, 2011, Jonathan Mora being over at your home; correct?

"[Defense Counsel:]  Objection.  Vague as to time.

7

"The Court:  Could you rephrase?  Sustained.

"[Prosecutor:]  [Defendant] did tell you that he remembers his friend Jonathan Mora maybe possibly being home at about 8:00 o'clock on December 2nd; correct?

"[Aguirre:]  No.

"[Prosecutor:]  Did [defendant] tell you another possibility was I had practice, I was probably at practice, maybe coming home about 8:00, 8:20, 8:30?  Did he tell you that?

"[Aguirre:]  No."

D.    TRIAL COURT DISCUSSION

At the time Aguirre testified, Officer Miller had not yet testified about defendant's statement concerning the different possible locations where he may have been during the shooting—the information came out in rebuttal.  Outside the presence of the jury, defendant's trial counsel said the prosecutor was "looking at a transcript while she's asking those questions [of Aguirre]. . . .  And [defense counsel was] thinking perhaps the People were quoting from a transcript of a jailhouse conversation, and there was going to be just an explosion in the courtroom here because [defense counsel] didn't have that [transcript]."

The prosecutor explained that she used defendant's statement to Officer Miller "when he said different possible places of where he may have been" when questioning Aguirre.  Defense counsel asserted that was improper impeachment because "nobody ever said those [statements] were said to the girlfriend.  They were said to the officers." Defense counsel asserted a remedy was needed for the improper impeachment.

8

The trial court asked if there was any indication defendant had discussed the various possibilities with Aguirre. The prosecutor responded, "The reason I questioned her is I'd asked her whether she talked about this case with him before testifying. She said yes. So I went into having—I didn't just make up where he might have been. I took his statement and said, 'Did he say to you whether he was at this place?' and 'Did he say to you whether he was at this place?' [¶] Those are defendant's statements to an officer. It's admissible. And I simply wanted to know if he had made these statements to her or not."

The trial court noted Aguirre had testified she did not discuss the case with defendant. The prosecutor said she believed Aguirre testified she did speak with defendant about the case. Defense counsel asserted Aguirre said she never spoke with defendant about the case. Defense counsel argued, "[T]his is very improper impeachment because there is—there's an infinity of—or at least a myriad of things that [defendant] has never said to Aguirre. It just doesn't make any sense. There's no basis in logic to ask her those questions. All it does is give the false impression that—that [defendant] has said things that may or may not have been said."

The prosecutor asserted there was no law indicating the questions were improper. The prosecutor argued she had "a right" to question Aguirre about the possible statements defendant could have made. The prosecutor explained, "I'm not making up my line of questioning. I'm basing my line of questioning on possible locations where the defendant told the officers he may have been."

The trial court said, "My issue is the following: Ms. Aguirre is getting confused because she doesn't know where all these things are coming from. She has already stated where [defendant] was December 2nd. In asking all of these other possibilities, my issue is it did sound like you had some kind of transcript of some jail call or something which would put those two in some sort of posture of making up alternatives. Well, maybe I was here, maybe I was there, maybe I was here. [¶] And I don't have any indication that she is aware of [defendant's] version of December 2nd events to the police. So it's kind of putting this witness in a posture where . . . she doesn't know where you're coming from and she's saying no and it sounds like perhaps she should be saying yes because those two had discussed alternate scenarios for where he might have been the night of the incident."

The prosecutor conceded she should have phrased the questions to Aguirre as, "Are you aware of that?" The prosecutor asserted the problem could be "clean[ed] up" by the defense during "cross-examination"—the prosecutor should have said "redirect examination." The prosecutor then faulted defense counsel for not raising the objection "vague as phrased," if the questions were confusing. The prosecutor asserted the information elicited was admissible. The prosecutor said she planned to call a police officer to impeach Aguirre's testimony that defendant was at home at the time of the shooting.

Defense counsel argued the cross-examination testimony was not admissible as impeachment because Aguirre testified defendant was at home watching television with her at the time of the shooting. Defense counsel argued there was no basis for using defendant's statement to another person against Aguirre. Defense counsel asked for a mistrial, or at the very least a pinpoint instruction informing the jury to disregard the disputed testimony. Defense counsel argued the problem could not be "clear[ed] up" on redirect examination.

The trial court said, "Well, now I'm hearing from [the prosecutor] that it's not really even impeachment. It's more of an inquiry so that she can bring on a later witness to show that these things were actually said and that this witness didn't have a clue as to any of that." The trial court said the prosecutor intended the testimony "to lay a foundation for later bringing in an officer." The trial court questioned why the testimony was not presented during the prosecutor's case-in-chief. The court said, "[I]t doesn't sound like it was rebuttal testimony from the outset."

Defense counsel asserted the prosecutor was looking at a transcript while questioning Aguirre, which gave the "very prejudicial" false impression that Aguirre was lying about a past conversation. The trial court said, "I'm going to let the questioning continue as to what this witness is aware of. But I will caution [the prosecutor] to phrase questions in such a way so as not to give the jury the false impression that there's some kind of transcript—or give the witness the false impression, for that matter." The court continued, "And my initial concern was that this witness was being questioned about something that might have been in a jail call.

11

That's what I thought. I thought maybe she and he did talk together. And now I'm worried about what the jury might think." The trial court denied the request for a mistrial.

When questioning resumed, the prosecutor asked, "Is your testimony that you have never spoken to the defendant, Isaac Belmontez, about what happened on December 2nd, 2011?" Aguirre responded, "No." As the questioning continued, the following exchange occurred:

"[Prosecutor:] [I]f you were made aware that the defendant indicated he might have been with Jonathan Mora on December 2nd, 2011, would that change your testimony about where [defendant] was?

"[Defense Counsel:] Objection. Calls for speculation.

"The Court: It will be sustained as vague as to time.

"[Prosecutor:] Are you aware that [defendant] indicated he might have been with—

"[Defense Counsel:] Objection. States facts not in evidence."

The court asked for defense counsel to wait for the prosecutor to finish the question. The prosecutor said she had no further questions.

During redirect examination, the following discussion occurred:

"[Defense Counsel:] Earlier when you were testifying, [the prosecutor] was asking various questions about various things. Were you ever confused about your testimony here today that you were, in fact, with [defendant] around 8:00 o'clock on the night of the shooting?

12

"[Aguirre:]  Yes.

"[Defense Counsel:]  When you say 'yes,' were you confused or are you sure that you were with [defendant] on the night of the shooting?

"[Aguirre:]  I was with him so—

"[Defense Counsel:]  Were you with him around 8:00 o'clock?

"[Aguirre:]  Yes."

In rebuttal, the prosecutor called Officer Miller, who testified defendant gave various locations as his possible whereabouts for the time of the murder:  (1) at football practice, (2) driving home from football practice, and (3) at home.

## DISCUSSION

Defendant asserts the prosecutor committed misconduct by improperly cross-examining Aguirre, who was the only defense witness.

"[A]n appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion.  [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) "'"The applicable federal and state standards regarding prosecutorial misconduct are well established.  '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"'  [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'  [Citation.]"

[Citation.]'  [Citation.]"  (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 241 [Fourth Dist., Div. Two].)

"[A] determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct.  [Citation.]"  (*People v. Crew* (2003) 31 Cal.4th 822, 839.)  Rather, the issue is whether the defendant's right to fair trial was impacted by the prosecutor's conduct.  (*People v. Epps* (1981) 122 Cal.App.3d 691, 706.)  "It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.  [Citations.]"  (*People v. Warren* (1988) 45 Cal.3d 471, 480-481.)  Stated differently, if a prosecutor has evidence, which provides a good faith belief in the existence of a preliminary fact, then the prosecutor is entitled to question the witness in an attempt to establish a foundation for further evidence related to the good faith belief.  (*People v. Lucas* (1995) 12 Cal.4th 415, 467.)

The problem we encounter in this case is the prosecutor made almost no attempt to establish a foundation for the supposed conversation between defendant and Aguirre. The prosecutor asked if defendant and Aguirre had ever discussed defendant's whereabouts at the time of the shooting.  Aguirre denied any such conversation occurred, but the prosecutor probed further and, without immediate objection, asked questions about a conversation that supposedly took place.  The prosecutor failed to ask foundational questions that would have (1) explicitly established a basis for a good faith belief in the theory that defendant and Aguirre discussed his whereabouts at the time of the murder, and (2) clarified exactly what conversation was being discussed with

14

Aguirre.  For example, (1) when did the conversation with defendant take place; (2) where did that conversation take place; and (3) were other people present during the conversation.  (*People v. Singh* (1912) 20 Cal.App. 146, 149 [foundation requires the circumstances of the time and place the statement was made and the people present, so a defendant or witness may intelligently deny, affirm, or explain the statements].)

The prosecutor leapt haphazardly into a cross-examination that had no foundation.  The results were confusing, as stated by Aguirre, the trial court, and defendant's trial counsel.  While we agree the cross-examination may have been confusing, we conclude the trial court did not abuse its discretion by concluding the prosecutor's conduct did not rise to the level of misconduct.

The flaw in defendant's argument lies with Aguirre's response to the prosecutor's second question about the supposed conversation.  The prosecutor asked, "Now, when you spoke to [defendant], was one of the possible locations of where he was on December 2nd, 2011, did he tell you he might be coaching a flag football team?"  Aguirre responded, "Yes."  At that point, Aguirre contradicted her earlier testimony that she had not spoken to defendant about his possible whereabouts on the night of the shooting, thus opening the door to further questions about the alleged conversation.  The prosecutor then went on to question Aguirre about various possible locations defendant may have told Aguirre he could have been during the shooting.  The locations mentioned by the prosecutor were consistent with the locations defendant mentioned to Officer Miller.

The logic behind the cross-examination questions appears to be that defendant made statements concerning his whereabouts to Officer Miller, so defendant may have made similar statements to Aguirre. The trial court could view this as valid reasoning for a good faith belief because: (1) Aguirre gave contradictory testimony concerning whether she had spoken to defendant about his possible location at the time of the shooting, and (2) it is within the realm of reasonable possibilities that defendant gave the same information to Aguirre that he gave to Officer Miller, since it was essentially only a timeline of his evening (football practice, driving home, and home). Since there is a logical means of concluding the prosecutor had a good faith belief behind the line of questioning, and the questions were connected to the potential evidence related to Officer Miller's and defendant's conversation,[3] we must conclude the trial court did not abuse its discretion in finding the prosecutor did not commit misconduct.

We are not concluding the prosecutor's questions were artful or well worded. As explained *ante*, the lack of foundation could be viewed as confusing. We are only concluding that it was within the bounds of reason for the trial court to conclude the prosecutor had a good faith belief defendant discussed the same possible locations with Aguirre that he did with Officer Miller (once Aguirre contradicted herself about speaking to defendant), thus causing the line of questioning to not be prosecutorial misconduct, i.e. it was not reprehensible or deceptive.

---

[3] We refer to defendant's conversation with Officer Miller about the possible locations as "potential evidence" because Officer Miller had not testified about the conversation at the time Aguirre testified.

Defendant asserts the combination of the improper questions and use of the transcript caused the prosecutor's behavior to be reprehensible. We are limited to looking for an abuse of discretion, which means we must affirm if the trial court's decision was rational. (*People v. Carmony* (2004) 33 Cal.4th 367, 376 [an abuse of discretion occurs when a decision is irrational or arbitrary].)

In the circumstances of this case, given the prosecutor's lack of foundational questions, the use of the transcript could be viewed as a reasonable means of ensuring the prosecutor kept the questions to Aguirre consistent with the information defendant gave to Officer Miller. In other words, rather than viewing the use of the transcript as a reprehensible or deceptive tactic, the trial court could reasonably view the use of the transcript as a beneficial tool to keep the questions connected to the evidence, which was necessary given the lack of foundation. For example, the transcript likely reminded the prosecutor of the locations defendant mentioned to Officer Miller, so the prosecutor's cross-examination of Aguirre stayed within the bounds of that information—it kept the questions connected to potential evidence, thus keeping the examination within the bounds of a good faith belief. Again, we are not endorsing the prosecutor's methods. We are only concluding one could reasonably view the conduct as not being reprehensible. Stated differently, the cross-examination was inartful, but it did not rise to the level of misconduct.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                    J.

We concur:

RICHLI _____
              Acting P. J.

KING _____
                        J.